Argued December 4, 1967, affirmed January 24, United States
Supreme Court denied petition for certiorari
June 10, 1968

## STATE OF OREGON, *Respondent, v.*
## ANNETTE L. BUCHANAN,
*Appellant.*

436 P. 2d 729

*Arthur C. Johnson,* Eugene, argued the cause for appellant. With him on the briefs were Leslie M. Swanson, Jr., Edwin C. Thomas, and Johnson, Johnson & Harrang, Eugene.

.*John B. Leahy,* District Attorney, Eugene,. argued the cause and filed a brief for respondent.

William P. Rogers and Royall, Koegel, Rogers and Wells, New York, N. Y.; filed a brief for the American Society of Newspaper Editors as amicus curiae.

Gerald J. Norville, Herbert M. Schwab, and Rives & Rodgers, Portland,. filed a brief for Sigma Delta Chi as amicus curiae.

Keith D. Skelton, Eugene, filed a brief for the Oregon Newspaper Publishers Association as amicus curiae.

Before PERRY, Chief Justice, and MCALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

GOODWIN, J.

This is an appeal from a judgment of contempt of court. The only issue is whether freedom of the press[1] gives a newspaper reporter the constitutional right[2] to preserve the anonymity of an informer in the face of a court order requiring disclosure.

Conceding that neither she nor her informers had

---

[1] "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." Oregon Constitution, Art I, § 8.

"Congress shall make no law * * * abridging the freedom of speech, or of the press * * *." United States Constitution, Amendment I.

"* * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States * * *." United States Constitution, Amendment XIV.

[2] In the only case that has come to our attention in which this privilege was asserted to be a constitutional right and in which an appeal was taken to the Supreme Court of the United States, certiorari was denied. Garland v. Torre, 259 F2d 545 (2d Cir), cert. denied 358 US 910 (1958).

statutory[3] or common-law privileges,[4] Annette Buchanan, a writer for a student newspaper, asserted on constitutional and professional-ethics[5] grounds that she had the right, after a publication, to refuse to disclose the identity of her source of information.

The issue arose upon a court order in aid of a grand-jury investigation into the use of marijuana in Lane County. Miss Buchanan had promised seven persons who claimed to be marijuana users that if they permitted her to interview them for publication she would under no circumstances reveal their names. Miss Buchanan reported the results of the interviews, using fictitious names. This publication produced a well-publicized[6] confrontation with the then district

---

[3] "There are particular relations in which it is the policy of the law to encourage confidence, and to preserve it inviolate; therefore a person cannot be examined as a witness in the following cases: * * *." ORS 44.040. (List includes husband and wife, attorney and client, priest and penitent, physician and patient, public officer and official communication, stenographer and employer, professional nurse and patient, certified psychologist and client.) .

[4] At common law only the priest, physician, and lawyer were recognized for testimonial purposes as parties to privileged communications, and each could be released only by the other party to the communication or by law in certain situations. It was not the identity of the privileged party that was to be protected, but the contents of the communication. At common law each of the privileged professionals was subject to rigorous intraprofessional discipline and, except for the priest in modern times, to governmental licensing and discipline as well.

[5] "* * * Though there is a canon of journalistic ethics forbidding the disclosure of a newspaper's source of information,— a canon worthy of respect and undoubtedly well founded, it is subject to a qualification,—it must yield when in conflict with the interests of justice,—the private interests involved must yield to the interests of the public." In the Matter of Wayne, 4 US Dist Ct Hawaii 475 (1914).

[6] "The public interest at stake in this contempt case is not that persuasive. If the district attorney and other law enforcement officers had done their own investigative work competently,

attorney culminating in the proceedings which led to this appeal.

In the trial court, testimony and argument were addressed to the social value and professional desirability of the asserted privilege.[7] The trial court, however, was of the opinion that the asserted privilege was not a right of constitutional stature and that the public-policy questions were of a kind that should be left to the Legislative Assembly.[8] A fine of $300 was imposed.

Miss Buchanan seeks reversal on the ground that the constitutionally protected freedom of the press necessarily includes freedom to gather news. Since certain news stories cannot be obtained unless the reporter can promise anonymity to a confidential informer, she argues that a judicial order requiring disclosure abridges a protected freedom. The social values which favor a free press, she argues, should be judicially balanced against those which favor the discovery and prosecution of law violators. It may be true, as the defendant argues, that some balancing of

---

they would not have had to try to coerce a college student to turn unwilling informer. It is to her credit that she refused to play their childish game." New York *Times,* June 29, 1966.

[7] A prototype of such privilege is found in HB 1020 (1967), Oregon House of Representatives, which provided in part as follows:

"It is hereby declared to be the public policy that no person engaged in the work of gathering or disseminating news shall be required to disclose before any proceeding or by any authority the source of information procured by him in the course of such work unless disclosure be essential to prevent injustice or to protect the public interest, and an order for such disclosure is made by a court of competent jurisdiction."

The bill (which failed of enactment) is commented upon in Note, 46 Or L Rev 99 (1966).

[8] This view drew support from In re Taylor, 412 Pa 32, 193 A2d 181, 7 ALR3d 580 (1963).

values occurs when district attorneys ignore the reports in the popular press based upon anonymous confessions concerning drug use, abortions, and other activities in which law violations may have played a part.[9] This social phenomenon, however, is not relevant to the defendant's underlying assumption that the "press" has a right to gather information superior to that which other members of society can assert. While the government from time to time extends to selected representatives of news media privileges (such as access to war zones and seats on a presidential aircraft) not accorded the general public, it has not been suggested that these privileges are necessarily rights conferred by the Constitution solely upon those who can qualify as members of the press.

On the contrary, it has been held that those claiming to be news gatherers have no constitutional right to information which is not accessible to the public generally.[10]

In the decisions dealing with the reporter's asserted right to refuse to disclose his source of information, the courts have held that rights of privacy, freedom of association, and ethical convictions are subordinate to the duty of every citizen to testify in court.[11]

■ Indeed, it would be difficult to rationalize a rule that would create special constitutional rights for

---

[9] Note, *The Right of a Newsman to Refrain from Divulging the Sources of His Information*, 36 Va L Rev 61, 74 (1950).

[10] See, e.g., Matter of United Press Assns. v. Valente, 308 NY 71, 123 NE2d 777 (1954); Tribune Review Publishing Company v. Thomas, 254 F2d 883 (3d Cir 1958); Brumfield v. State, 108 So2d 33 (Fla 1958). Cf. Seymour v. United States, 373 F2d 629 (5th Cir 1967) (upholding contempt conviction while assuming without deciding that restricting the gathering of news might in some cases be an abridgment of the freedom of the press).

[11] Garland v. Torre, supra note 2; In re Goodfader, 45 Hawaii 317, 367 P2d 472 (1961); In re Taylor, supra note 8.

those possessing credentials as news gatherers which would not conflict with the equal-privileges and equal-protection concepts also found in the Constitution.[12] Freedom of the press is a right which belongs to the public; it is not the private preserve of those who possess the implements of publishing. See Note, 46 Or L Rev 99 (1966).

Apart from the definitional difficulties in attempting to give constitutional status to a privilege for qualified news gatherers which presumably would be denied to less favored classes, there is another objection to discrimination between news gatherers and other persons. Such a practice would be potentially destructive of the very freedom that is sought to be preserved by this appeal. After the lessons of colonial times,[13] the First Amendment required the federal government to resist the normal temptation of rulers to regulate, license, or otherwise pass upon the credentials of those claiming to be authors and publishers. An invitation to the government to grant a special privilege to a special class of "news gatherers" necessarily draws after it an invitation to the government to define the membership of that class. We doubt that

[12] "* * * nor shall any State * * * deny to any person within its jurisdiction the equal protection of the laws." United States Constitution, Amendment XIV.

[13] The licensing acts, which prevailed in England during most of the period from Charles I until William and Mary, influenced the colonies by way of instructions to the royal governors. The following is representative:

"And forasmuch as great inconvenience may arise by the liberty of printing within our said territory under your government you are to provide by all necessary orders that no person keep any printing-press for printing, nor that any book pamphlet or other matters whatsoever be printed without your especial leave and license first obtained." Clyde A. Duniway, The Development of Freedom of the Press in Massachusetts, p. 65 (Longmans, Green and Co. 1906).

all news writers would want the government to pass upon the qualifications of those seeking to enter their field.

The scope-of-employment test contemplated by typical statutes creating such privileges appears to approach the problem from two sides: (a) the person claiming the privilege is "engaged in the work of gathering," and (b) the material being gathered is "news." Statutory distinctions may or may not be made among the media to be used for dissemination.[14] The statutes generally omit any guidance as to what is "work" and what is "news."[15]

Assuming that legislators are free to experiment with such definitions, it would be dangerous business for courts, asserting constitutional grounds, to extend to an employe of a "respectable" newspaper a privilege which would be denied to an employe of a disreputable newspaper;[16] or to an episodic pamphleteer; or to a free-lance writer seeking a story to sell on the open market; or, indeed, to a shaggy nonconformist who wishes only to write out his message and nail it to a tree. If the claimed privilege is to be found in the Constitution, its benefits cannot be limited to those whose credentials may, from time to time, satisfy the government.

Since we decline to attempt a constitutional definition of "news" and "news reporters," we have not dis-

---

[14] See, for a purely statutory privilege, Application of Cepeda, 233 F Supp 465 (SD NY 1964), which held that a statute granting privilege to writers employed by a newspaper, press association, or wire service did not protect a journalist working for *Look* Magazine.

[15] See, e.g., HB 1020 (1967), supra note 7.

[16] Near v. Minnesota, 283 US 697, 721, 51 S Ct 625, 75 L Ed 1357 (1931).

cussed a secondary argument advanced in this appeal: that we should fashion for those eligible to enjoy it a privilege limited to cases in which secrecy is an aid to social criticism aimed at reforming the law.

■ We hold that there is no constitutional reason for creating a qualified right for some, but not others, to withhold evidence as an aid to newsgathering. We do not hold that the Constitution forbids the legislative enactment of reasonable privileges to withhold evidence.[20] That question is not before us. We hold merely that nothing in the state or federal constitution compels the courts, in the absence of statute, to recognize such a privilege.

Affirmed.

---

[20] Our attention has been directed to the enactment in thirteen states of legislation which appears to create a statutory right of newspaper, radio, and television employes to reveal the contents of a communication without being required to reveal the name of its author:

Ala Code tit 7, § 370 (1958);
Ariz Rev Stat Ann § 12-2237 (Cum Supp 1966);
Ark Stat Ann § 43-917 (1964);
Cal Evidence Code § 1070 (1966);
Ind Ann Stat § 2-1733 (Cum Supp 1966);
Ky Rev Stat § 421.100 (1963);
La Rev Stat §§ 45:1451 to 45:1454 (Cum Supp 1965);
Md Code Ann art 35, § 2 (1965);
Mich Stat Ann § 28.945 (1) (1954);
Mont Rev Code § 93-601-1, 93-601-2 (1964);
NJ Stat Ann §§ 2A:84A-21, 2A:84A-29 (Cum Supp 1966);
Ohio Rev Code Ann §§ 2739.04, 2739.12 (Supp 1966);
Pa Stat Ann tit 28, § 330 (Cum Supp 1965).