STATE, Respondent, v. KNOPS, Appellant.

*No. State 146.  Argued December 2, 1970.—Decided February 2, 1971.*
(Also reported in 183 N. W. 2d 93.)

648

For the respondent the cause was argued by *Jeffrey B. Bartell*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

A brief amicus curiae was filed by *Hayes, Peck, Perry & Gerlach* and *Richard Perry*, all of Milwaukee, for the Wisconsin Civil Liberties Union.

HANLEY, J. Two issues are presented on this appeal:

(1) Did the county court order requiring appellant, a reporter, to disclose confidential news sources to a grand jury violate the first amendment of the United States Constitution; and

(2) Did the county court err in failing to require the state to demonstrate a compelling need for appellant's testimony prior to issuing judicial process to require such testimony?

*Question of violation of first amendment.*

Knops' argument that as a journalist he has a legally cognizable privilege not to reveal his sources is hardly a novel one. In 1897, the California Supreme Court reviewed and rejected the argument in the case of *Ex parte Lawrence & Levings* (1897), 116 Cal. 298, 48 Pac. 124, wherein a newsman who printed a story alleging that bribery was rampant in the state legislature could not refuse to divulge his source to a committee of the legislature created to investigate those same charges. Since the turn of the century the argument has been frequently proposed and consistently rejected by numerous state courts. *See* Annot. 7 A. L. R. 3d 591.

However, while Knops' argument may not be new, his theoretical basis for it is of recent vintage. It appears that not until 1958 did any reporter attempt to base his purported privilege on the first amendment guarantee of freedom of the press. In *Garland v. Torre* (2d Cir. 1958), 259 Fed. 2d 545, certiorari denied (1958), 358 U. S. 910, 79 Sup. Ct. 237, 3 L. Ed. 2d 231, a theory substantially the same as that relied on by the appellant was found to be plausible but insufficient to justify the withholding of information.

In *Garland*, a gossip columnist, Marie Torre, printed certain defamatory remarks about singer Judy Garland. Miss Garland sued the Columbia Broadcasting System and subpoenaed Miss Torre who refused to reveal the name of her source. On appeal the court, speaking through Judge (now Justice of the United States Supreme Court) POTTER STEWART accepted Torre's proposition that compelled disclosure would entail some diminution in the availability of news and thereby abridge to some extent the freedom of the press. But the court noted that such diminution was not a critical consideration because freedom of the press had never been an absolute right anyway. The court noted that

the duty of witnesses with relevant information to come forward and testify was a duty rooted just as deeply in our history as was the free press concept. In weighing these conflicting values, the court concluded that since the information being withheld "went to the heart of the plaintiff's case" the defendant must disclose the information sought.

The *Garland* decision is remarkable because its clear implication was that had the information being withheld not gone "to the heart of the plaintiff's case," it might indeed have been privileged. Such a privilege, premised on the first amendment, had not previously been recognized.

Appellant's argument next appeared three years later in 1961, in *In re Goodfader* (1961), 45 Hawaii 317, 367 Pac. 2d 472, where the plaintiff was suing three civil service commissioners for reinstatement to her position as personnel director of the commission. She had alleged that the dismissal was wrongful and based on improper motives. Goodfader, a reporter, testified that he knew from a reliable source that the firing was without proper grounds but he refused to reveal that source.

In *Goodfader*, just as in *Garland*, the court accepted without discussion the idea that the public is entitled under the first amendment to a free flow of information from the press and that such flow would be impeded by compelled disclosure. Notwithstanding these considerations, the court found that the ability of our system of justice to obtain relevant evidence was of greater importance.

Appellant's argument received its briefest and rudest treatment to date in Pennsylvania in 1963. In 1963, the Pennsylvania Supreme Court decided the case of *Taylor & Selby Appeals* (1963), 412 Pa. 32, 193 Atl. 2d 181, 7 A. L. R. 3d 580. In the *Taylor Case,* The Philadelphia *Bulletin* printed a story purporting to reveal the substance of a current grand jury investigation.

The *Bulletin* revealed in print that the source of its story was one John Fitzpatrick and certain documents supplied to The *Bulletin* by Fitzpatrick. Pennsylvania has a statute which prohibits compelled disclosure of a newspaper's "source of information." The grand jury served The *Bulletin* with a subpoena duces tecum ordering production of the documents. The court below held that the state statute creating a privilege of nondisclosure applied only to human sources, not to documentary sources of information. On appeal The *Bulletin* argued that apart from the statute, the first amendment of the federal constitution created a privilege of nondisclosure which privilege encompassed all of a newspaper's sources. The Pennsylvania Supreme Court was unimpressed with the first amendment argument and rejected it summarily. But the court then went on to hold that the state statute covered both human and documentary sources.

In 1968, the Oregon Supreme Court handed down a decision in the case of *State v. Buchanan* (1968), 250 Or. 244, 436 Pac. 2d 729. Miss Buchanan was the editor of a college newspaper wherein she printed a story about the use of marajuana by fellow students on her campus. The local district attorney took a great interest in Miss Buchanan's story and asked her to tell the grand jury the identities of the students she saw smoking pot. She refused and asserted the first amendment as the source of her privilege. The court held that her argument—that merely being a member of the press endowed her with a privilege—was not a valid argument. The court said that her argument presumed ". . . that the 'press' has a right to gather information superior to that which other members of society can assert. . . ." The court went on to note that:

". . . Freedom of the press is a right which belongs to the public; it is not the private preserve of those who possess the implements of publishing. . . ."

The idea that it was the public who would benefit from the finding of a privilege was apparently not presented to the court; and the conclusion the court reached was that if only "newsgatherers" were granted the privilege, this would constitute a denial of equal protection to other members of the public who were not newsgatherers.

A review of *Garland, Goodfader, Taylor* and *Buchanan Cases* demonstrates that appellant's theory of privilege is quite new, and the courts which have dealt with it have not found a consistent approach to the problem.

Appellant acknowledges that the decisions in this area are characterized by uncertainty and inconsistency, but he argues that this is not unusual when the courts are dealing with an "emerging constitutional right."

Appellant points to the very recent decision of the *Application of Caldwell* (N. D. D. C. Cal. 1970), 311 Fed. Supp. 358, as the definitive statement to date on the theory of a newsman's first amendment privilege of non-disclosure of his sources. Earl Caldwell was and is a reporter for the New York *Times*. Caldwell's decision came on as a motion to quash a subpoena ad testificandum. This subpoena summoned:

". . . Mr. Caldwell to appear and give testimony relative to interviews with officers and spokesmen of the Black Panther Party, which interviews conducted by Mr. Caldwell, movants assert were confidential and within the scope of a relationship of trust . . . ."

The district court in *Caldwell* refused to quash the subpoena on the grounds that:

". . . It has long been settled 'that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which *every person* within the jurisdiction of the government is bound to perform upon being properly summoned' . . . ." *Blair v. United States* (1919), 250 U. S. 273, 281, 39 Sup. Ct. 468, 63 L. Ed. 979; *United States v. Bryan* (1950), 339 U. S. 323, 70 Sup. Ct. 724, 94 L. Ed. 884.

Although the court did compel attendance, it nevertheless recognized Caldwell's first amendment argument to the extent that it issued a protective order stating that Caldwell:

(1) ". . . shall not be required to reveal confidential associations, sources or information received . . . by him . . ." and

(2) ". . . specifically . . . shall not be required to answer questions concerning . . . information given to him by members of the Black Panther Party . . . ."

The court finally provided that its protective order would be withdrawn and nullified if and when the government shows:

". . . a compelling and overriding national interest in requiring Mr. Caldwell's testimony which cannot be served by any alternative means. . . ."

Caldwell appealed this decision, arguing that it still required him to attend the grand jury inquiry and that his mere attendance behind closed doors and in secret session would destroy his credibility when he later tried to promise confidentiality to his sources. Caldwell's appeal to the United States Court of Appeals for the Ninth Circuit was decided on November 16, 1970 (434 Fed. 2d 1081). On that appeal the government did not contest the propriety of the protective order issued by the district court. The only issue was whether or not Caldwell should be required to attend the grand jury session. The Court of Appeals held that the protective order did not go far enough in protecting the first amendment interests which were in jeopardy. The court held that he need not attend at all until such time as the government could make a showing of an overriding interest and lack of an alternative source.

At the end of its opinion, the court carefully noted that substantial credible evidence in the record had convinced the court that Caldwell's sources—the Black

Panthers—were much more sensitive to possible breaches of confidence than were most groups. This fact, combined with the fact that the grand jury had no specific crime or question that it wanted to ask Caldwell about, is what led the court to conclude as it did.

Appellant here does not ask, as did Caldwell, that he be allowed to ignore the subpoena entirely. He asks that he be afforded the same prerequisite as the district court afforded to Caldwell before disclosure could be compelled.

Appellant's entire argument rides on the validity of his contention that disclosure will actually result in a diminution of the free flow of news that the public is entitled to read. What the public is entitled to read is no doubt a much broader category than what the public is interested in reading. In this case the public was treated, in the *Kaleidoscope* article, to a long polemic on how property destruction and murder were simply necessary steps en route to a higher goal—the restructuring of society.

In weighing the value which the public derives from receiving this information appellant cites *Bridges v. California* (1941), 314 U. S. 252, 265, 62 Sup. Ct. 190, 86 L. Ed. 192, for the proposition that the framers of the constitution

". . . intended to give to liberty of the press, as to other liberties, the broadest scope that could be countenanced *in an orderly society.*" (Emphasis supplied.)

That may very well have been the intention of the framers. However, in a disorderly society such as we are currently experiencing it may well be appropriate to curtail in a very minor way the free flow of information, if such curtailment will serve the purpose of restoring an atmosphere in which all of our fundamental freedoms can flourish. One exceedingly fundamental freedom which the public is currently doing without

is the freedom to walk into public buildings without having to fear for one's life. If the public were faced with a choice between learning the identity of the bombers or reading their justifications for anarchy, it seems safe to assume that the public would choose to learn their identities.

The identities of the bombers or information leading to those identities is what the grand jury is asking Knops to tell them, if he can. If he cannot, he simply needs to so state.

The fact situation here is so remote from that in *Caldwell* that even if this court were to accept the premises of the *Caldwell* decision, it would still be inapplicable to this case. Unlike *Caldwell*, the appellant here does not face an unstructured fishing expedition composed of questions which will meander in and out of his private affairs without apparent purpose or direction.

On the contrary, he faces five very narrow and specific questions, all of which are founded on information which he himself has already volunteered. The purpose of these questions is very clear. The need for answers to them is "overriding," to say the least. The need for these answers is nothing short of the public's need (and right) to protect itself from physical attack by apprehending the perpetrators of such attacks.

We conclude that a weighing of competing values is involved here. The court must consider on the one hand the interest of free flow of information, and on the other, the interest of fair and effective administration of the judicial system. Here the appellant's information could lead to the apprehension and conviction of the person or persons who committed a major criminal offense resulting in the death of an innocent person. The information sought may remove threats of repetition of the offenses. In weighing these conflicting values, we think under the facts of this case the appellant is compelled to disclose the information sought.

■

*Affirmative proof of compelling need.*

Appellant contends that even if the constitution does not provide an absolute right to journalists to refuse to divulge confidential sources of information, nevertheless, the state must affirmatively demonstrate in each case: (1) The substantiality of the state interest to be served by compelling the testimony, and (2) the lack of an alternative method, less restrictive of first amendment rights, by which such objective could be served.

We think the solution of the crime involved here and the prevention of repetition of such crimes constitutes a compelling need. The administration of criminal justice itself is a sufficient substantial interest of the state.

Next, appellant contends that the state must show that there are no alternative methods by which it may secure the desired information.

We think that if there are alternative methods of gaining this information, appellant should point them out. He asks too much when he asks the court to presume that state officers could gain this information elsewhere but have chosen to wait and see if Mr. Knops will supply it. The mere fact that the culprits are still at large is nearly conclusive proof that the state does not know who they are. In view of these considerations, it would unnecessarily impede the solving of this case to require the state to go through the empty ritual of proving that which is already obvious, namely, that the identity of the culprits is unknown.

We conclude that the appellant has a constitutional right to the privilege not to disclose his sources of information received in confidential relationship. However, when such confidence is in conflict with the public's overriding need to know, it must yield to the interest of justice. Under the facts and circumstances of this case, we think the public's right to know outweighs the appellant's right of privilege.

*By the Court.*—Judgment affirmed.

HEFFERNAN, J. (*concurring in part; dissenting in part*). I agree with the major premise of the majority opinion. It sets forth what is now the law of this state— that a journalist may assert a constitutional privilege to protect the confidentiality of his news sources. As a clarification of a significant and fundamental first amendment right of the freedom of press, the opinion will stand as a landmark in legal history.

As the writer of this opinion understands the majority position, we hold that a journalist (including without distinction one of the underground press) shall not be compelled to reveal the confidential associations or confidential information upon which published news stories are based. Such right, however, is made subject to the right of the state to compel testimony in the event that the journalist's testimony is required in the furtherance of a compelling and overriding interest that cannot be served by any alternate means.

We also hold, following *Caldwell*, as I understand the majority opinion, that the "compelling and overriding interest" of the state must be demonstrated to the court as a prerequisite for the issuance of a subpoena that would compel the production of either testimonial or documentary evidence.

While the majority holds that the privilege exists subject only to the compelling state interest test, it finds that compelling state interest by the process of judicial notice. It takes notice of disorders that have wracked our society in recent months and the compelling state interest in assuring order and the safety of our citizens.[1]

---

[1] I do not agree with the majority opinion's generality that freedom of information should be curtailed on the theory that "curtail[ing] in a very minor way the free flow of information . . . will serve the purpose of restoring an atmosphere in which all our fundamental freedoms can flourish." I know of no period in history where any freedoms have flourished in the face of the state's curtailment of the free flow of information. The majority's stated generality does not do justice to its own sound position—

From this, it properly concludes that the information concerning the arson of a state university building and the bombing of Sterling Hall and the United States Mathematics Research Center on the University of Wisconsin campus are acts fraught with such grave implications to our society that the privilege must fall.[2]

Up to this point, I am in substantial agreement with the majority opinion, but I believe it fails to properly apply its own test of whether the state's compelling interest could be served by "alternative means" not requiring an impingement upon constitutional rights.

The majority assumes that no alternative method of getting any of this information is available because, "The mere fact that the culprits are still at large is nearly conclusive proof that the state does not know who they are."

This writer takes judicial notice of the official records of both the State and the United States that show that officers of both the State and the United States Department of Justice under oath have stated that they now know who bombed Sterling Hall. Federal warrants have been issued for the arrest of the suspects. We cannot conclude, merely because these suspects have not yet been arrested, that the state requires further information as to the identity of the Sterling Hall bombers. The writer of this opinion takes judicial notice of the statement of United States Attorney John Olson declaring that the United States has full information in regard to the identity of the Sterling Hall bombers and that Mark Knops' testimony in that respect is now superfluous. It thus seems clear that in respect to the testi-

which is not one approving the curtailment of information, but compelling, in the case of overriding state interest, the *production* of information by proper legal process.

[2] I do not agree with the majority's dicta that, merely because a crime is charged, the state meets its burden of proving a compelling interest. The state's interest is dependent upon the nature of the crime. Here, the nature of the crime satisfies the test.

mony sought in regard to the Sterling Hall bombing, the information has already been attained by alternate means. The State of Wisconsin no longer has a compelling state interest in having Knops testify to what is already known.

It continues to have a compelling state interest in the arson of Old Main Hall on the Whitewater campus. Accordingly, I would agree with the majority's determination to affirm the finding of contempt. However, since the question of Knops' purging himself in regard to the Sterling Hall questions is now moot, I would return the cause to the trial court for resentencing, bearing in mind that, under the test laid down by the majority of this court, no compelling interest exists for Knops' testimony in regard to the source of his information about the University of Wisconsin Sterling Hall bombing.

I concur in the affirmance of the finding of contempt, but would remand for resentencing.