ZELENKA, Plaintiff in error, v. STATE, Defendant in error.

*No. 76–145–CR. Argued April 6, 1978.—Decided June 6, 1978.*
(Also reported in 266 N. W. 2d 279.)

602

For the plaintiff in error the cause was argued by *Jack E. Schairer,* assistant state public defender, with whom on the brief was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

Brief amicus curiae for Newspapers, Inc., Wisconsin Associated Press, and Sigma Delta Chi (Milwaukee Chapter) was filed by *James P. Brody, Jon P. Christiansen,* and *Foley & Lardner,* all of Milwaukee.

BEILFUSS, C. J. Upon this review the defendant contends the trial court erred in failing to suppress the defendant's pretrial oral and written statements; in failing to receive polygraph results of the defendant's father at the suppression hearing; and in sustaining a newsman's privilege not to divulge his sources. He further contends the trial court lost jurisdiction after the case was remanded to the county court for supplemental preliminary hearings, and that the evidence is not sufficient to sustain the verdicts finding the defendant guilty as to both counts.

The deceased, Michael Posthuma, lived with his wife in rural Dodge county. He had, on occasions at least, bought and sold drugs in the Dane county area.

In early June of 1975, Posthuma discussed purchasing about one-fourth of a ton of marijuana from Ronald Schilling. There were at least two discussions between Posthuma, Schilling, Tom Stanton, William Cook, and Robert Zelenka, the defendant in this case, concerning

the purchase. The deal was arranged. The marijuana was to be picked up near Wisconsin Dells on June 9th.

On June 9th Posthuma borrowed a van-type truck from a neighbor and left his home with $2,100 in cash. That was the last time Mrs. Posthuma saw her husband alive. Posthuma met again with Schilling, Stanton and Zelenka for the final details. While there Posthuma went to the bathroom and, according to Zelenka's testimony, he was told by Stanton and Schilling that they were going to "rip-off" Posthuma and he was asked to "hit" Posthuma. Zelenka states he understood "hit" to mean "strike" Posthuma on the head and he refused to do so. He agreed to go along. Zelenka was to drive the truck to a remote area where the robbery was to take place. Schilling, Stanton, Zelenka and Posthuma entered the truck, with Zelenka driving. He drove to a rural area near Sun Prairie. On St. Albert Road, Stanton said "here" and Zelenka heard a thud and stopped the truck. He saw Posthuma lying on his side and saw Stanton strike Posthuma on the head with a hammer. He also saw Schilling stab Posthuma several times with a knife. Zelenka testified he tried to stop Schilling and became sick to his stomach. Posthuma was not dead when he was pulled out of the truck. His body was dragged into the woods and left there near a creek. Zelenka states he did not help drag the body but Schilling or Stanton claimed he did. Zelenka cleaned the blood out of the truck and the truck was driven to the East Towne Shopping Center in Madison and abandoned in the parking lot.

Zelenka received $1,000 from the proceeds of the robbery. Stanton, Schilling and Zelenka went to a clothing store in the shopping center and purchased new clothing. The clothes that all three were wearing were wet and muddy. Zelenka knew one or more of the employees of the store, had some drug deals with one of them, and repaid a $200 loan.

The next day Zelenka purchased three one-way air fare tickets to Florida for himself, his wife and child.

On June 10th, a twelve-year-old boy found Posthuma's bank book, a claw hammer, paint cans, rags and other items in a plastic bag which had been thrown in the creek near Rieder Road. These items were turned over to the police. The bank book indicated a withdrawal of $2,500 on June 9th.

Posthuma's body was found in a wooded area near St. Albert's Road on June 12th. An autopsy was performed. It revealed that Posthuma suffered three severe blows to the head and 24 stab wounds in his body. Posthuma bled to death from a stab wound which lacerated the thoracic aorta.

On June 14th Zelenka returned to Madison from Florida by bus. He called his father. Zelenka and his father voluntarily came to the Dane County Sheriff's Department at about 10:30 p.m.

The defendant Zelenka was advised of his constitutional rights. He signed a waiver form indicating that he understood his rights, did not want a lawyer, and wished to make a statement. Zelenka asked if he could get a lawyer later on. In response Detective Grann read back the portion of the statement of rights which stated that if he decided to answer questions without a lawyer he could still stop the questioning at any time, and that if he could not afford a lawyer one could be appointed.

Questioning continued from 10:40 to 1:04 a.m. Zelenka's father was present for most of this period, entering the room at 10:49 p.m. The interview was taped and transcribed. The tape recorder was turned off and the questioning stopped at 1:04 a.m., because Zelenka and his father were discussing whether he should have a lawyer before any additional statements were made.

After the initial questioning ceased, Zelenka was informed that he was under arrest for the first degree murder of Posthuma. During the interval between 1:04

and 1:35 a.m., a conversation continued but it was not taped. Zelenka took the position that the charge of first degree murder was not right and that he wanted to show facts to reduce the charge. Zelenka and his father discussed the advisability of obtaining counsel. Zelenka's father stated Zelenka should have counsel before he made any additional statements. However Zelenka decided that he wanted to continue the statement which resumed at 1:35 and lasted until about 3:30 a.m. Zelenka did not deny involvement in the incident but indicated that he had tried to stop Schilling from stabbing Posthuma. A suppression hearing was held, the motion to suppress the statements was denied, and tapes and transcripts were given to the jury at the trial.

Detective Grann testified at the trial that he had interviewed Schilling who agreed that Stanton had wielded the hammer and that he had stabbed Posthuma. Detective Charles Lulling also interviewed Schilling and the story was the same. Additionally he talked to Stanton who admitted using the hammer. Neither Stanton nor Schilling volunteered any information about Zelenka trying to stop the murder.

Michael Fellner, a writer for the underground newspaper "Take-Over," was called. He refused to divulge his sources for an article about the murder. The trial court did not order him to do so.

Zelenka was found guilty and convicted on both counts on December 11, 1975. His postconviction motions were denied on June 7, 1976. This court issued writs of error on June 28, 1976.

The defendant Zelenka's first challenge concerns the failure of the trial court to suppress the statements he made to the police on the night of June 14–15. This challenge can be separated into two parts: (1) The initial reading of his constitutional rights, and (2) the resumption of the interview after Zelenka had indicated that he wanted a lawyer.

After informing Zelenka of his rights, Zelenka asked if he could still get an attorney after signing the waiver. Zelenka contends that the trial court erred by finding that Detective Grann complied with *Miranda v. Arizona,* 384 U.S. 436 (1966), by re-reading the portion of the warnings dealing with Zelenka's continuing right to counsel rather than by affirmatively stating that—yes, a defendant always has a right to demand counsel at any time. The defendant cites *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938):

"The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused."

Zelenka points to the facts that he was a twenty-one year old man, just returned from Florida, whose father accompanied him to the station but who was not present when the waiver rights form was signed. The state correctly contends that these facts do not aid the defendant. Zelenka was a legal adult at the time he signed the waiver, and clearly his father's presence or absence was of no legal significance. This court has held that, even in the case of a minor, a parent's presence is not an absolute requirement for a valid waiver of constitutional rights.[1]

The defendant does not contend that he did not understand the meaning of his right to counsel after the portion was re-read. To the contrary, Detective Grann asked the defendant if he understood his rights at that point and Zelenka answered in the affirmative. *Miranda* does not dictate that all questioning must stop if the defendant merely raises a question as to the extent of his rights. There is no reason to conclude that a defendant does not understand his rights when he indicates that

---

[1] *Theriault v. State,* 66 Wis.2d 33, 41, 223 N.W.2d 850 (1974).

he does understand them, at least under the facts of this case.

This court has stated that the standard of review in determining compliance with the safeguards of *Miranda* and the determination of voluntariness is that the trial court's determination will not be reversed unless it is against the great weight and clear preponderance of the evidence; conflicts in the testimony surrounding a confession must be resolved in favor of the trial court's finding.[2] Under the facts it is clear that the trial court's determination that the defendant was aware of his rights and knowingly waived them is not against the great weight and clear preponderance of the evidence.

The more serious *Miranda* question in this case concerns the resumption of questioning after the defendant had indicated that he wished to have an attorney. There is no doubt that all questioning must cease when a defendant demands an attorney.[3] There is, however, some doubt as to whether, after interrogation has ceased because of the invocation of the right to an attorney, resumption of the interrogation within a short period is permissible notwithstanding the agreement of the defendant.

Zelenka relies on *Michigan v. Mosley*, 423 U.S. 96 (1975). In *Mosley* the court held that answers given during a second questioning were admissible where the second questioning was preceded by a re-reading of the *Miranda* warnings, where the second questioning took place after a "substantial" period of time (two hours), and where the second questioning was conducted by a

---

[2] *McAdoo v. State*, 65 Wis.2d 596, 605, 223 N.W.2d 521 (1974); *Roney v. State*, 44 Wis.2d 522, 533, 171 N.W.2d 400 (1969). *See also: Leach v. State*, 83 Wis.2d 199, 265 N.W.2d 495 (1978).

[3] *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966).

different officer and focused on an unrelated offense. 423 U.S. at 104–05.[4]

In this case there was a half-hour interval between interrogations and the defendant was interrogated by the same officer on the same offense. However, in response to a question Zelenka was told he could seek counsel at any time.

The state's primary argument is that the defendant, on his own initiative, requested that the interview be continued and that in such a case there is no presumption of coercion.[5] The state also relies on several Wisconsin cases which state that ". . . even after requesting counsel, a defendant may change his mind and volunteer a statement." *Sharlow v. State,* 47 Wis.2d 259, 269–270, 177 N.W.2d 88 (1970) ; *Wright v. State,* 46 Wis.2d 75, 88, 175 N.W.2d 646 (1970).

At the suppression hearing Detective Grann indicated that the discussion between interrogations was mainly between the defendant and his father, that the defendant favored going forward without counsel while his father advocated seeking counsel. Grann stated that his own participation in the discussion was in response to specific questions.

The defendant's father testified at the suppression hearing that during the interim period Detective Grann told his son that statements he would make after seeking an attorney would carry less weight than statements made without an attorney. He also stated that Grann indicated that the charge might be reduced if the defendant continued talking. Detective Grann denied making such statements.

Detective Grann merely answered the defendant's questions and then Zelenka volunteered to go ahead with his statement. This court has held that a defendant need

[4] *See also, Leach v. State,* 83 Wis.2d 199, 265 N.W.2d 495 (1978).
[5] *United States v. Rodriguez-Gastelum,* 22 Criminal Law Rptr. 2473 (1/30/78).

not be reinformed of his rights if it is clear that he knew them. *Grennier v. State,* 70 Wis.2d 204, 213, 234 N.W.2d 316 (1975); *Blaszke v. State,* 69 Wis.2d 81, 230 N.W.2d 133 (1975). A reading of the portion of the record concerning the detective's advice to Zelenka and his father convinces us that Zelenka knew he could get an attorney at any time and that he did not have to answer questions if he indicated he did not want to, nor if he indicated he wanted an attorney before answering any additional questions. The trial court could readily find Zelenka wanted to make additional statements in an effort to induce the officer to reduce the charge from first degree murder; and that there were no threats, promises, psychological pressures or unfair tactics used by the police officer. Under the totality of circumstances the trial court could have found that Zelenka was aware of his rights, particularly in light of the fact that the half-hour discussion was over whether to demand counsel or not.

The defendant next asserts that the trial court erred by refusing to admit the results of his father's polygraph tests at the suppression hearing. The tests were taken to prove claims that Detective Grann made improper comments after Zelenka asked for counsel on the night of June 14–15. In *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974), this court approved a limited use ban on polygraph examination results. As a prerequisite to admission, *Stanislawski* requires that prior to a witness' submission to a polygraph examination, the district attorney, the defense attorney, and the person taking the test stipulate to such test and its subsequent admission. There is no such stipulation here.

The defendant contends that the *Stanislawski* rule should be modified; the stipulation requirement should be removed and polygraph results should be treated like any other evidence. He advocates that this court

follow the lead of *United States v. Ridling*, 350 F. Supp. 90 (E.D.C. Mich. 1972), where the court held that a defendant's proffered polygraph results were admissible if the defendant would also submit to additional tests by a court-appointed polygraphist.

In *Gaddis v. State*, 63 Wis.2d 120, 216 N.W.2d 527 (1974), this court heard a request similar to the one at hand. The court took note of the *Ridling Case* and commented on its status as an isolated authority. The court concluded:

"[A]ll justices agree that, having determined in *Stanislawski* the proper procedure for the admission of polygraph evidence in this state, we ought not consider additional or alternative procedures so soon after relaxing the forty-year-old total ban on such evidence. Some experience with the by-stipulation-only procedure should be had before additions to it should be considered." 63 Wis.2d at 126.

We are not persuaded to change the rule of *Stanislawski* upon the experience and the arguments made to this date.[6]

The circuit court ordered this cause remanded for a supplemental preliminary hearing. It determined that the original preliminary which resulted in binding the defendant over for trial was defective because the defendant was not allowed to call certain witnesses. Accordingly, the trial court ordered a remand for a preliminary hearing limited to the purpose of allowing the defense to call Detectives Grann, Reuter and Lulling.

The defendant, upon this review, avers that the trial court could not order a limited preliminary; the only recognized option was to order a complete, entirely new preliminary. This court has held that a court, after bind over, may remand for a new preliminary.[7] We appar-

---

[6] *See State v. Mendoza*, 80 Wis.2d 122, 258 N.W.2d 260 (1977).

[7] *State ex rel. Freemon v. Cannon*, 40 Wis.2d 489, 491, 162 N.W. 2d 32 (1968).

ently have never considered a remand for a partial or limited preliminary. The defendant contends that the trial court could not order a partial remand, and that by doing so the court lost its jurisdiction.

The authorities cited by the defendant are scanty and unpersuasive. In particular, he fails to explain why a partial remand is forbidden when a complete remand is not. The defendant cites *State ex rel. Beck v. Duffy,* 38 Wis.2d 159, 166, 156 N.W.2d 368 (1968), in support of his position. However this case held that errors at a preliminary hearing could "only" be corrected in a new preliminary, subject to a new complaint, for errors prejudicial to the state. *Duffy* and its predecessor, *Tell v. Wolke,* 21 Wis.2d 613, 124 N.W.2d 655 (1963), can both be distinguished as cases dealing with recommencement after dismissal of the complaint.

Additional reliance is placed on sec. 971.02(2), Stats.:

*"Preliminary examination; when prerequisite to an information or indictment. . . .*

"(2) Upon motion and for cause shown, the trial court may remand the case for a preliminary examination. 'Cause' means:

"(a) The preliminary examination was waived; and

"(b) Defendant did not have advice of counsel prior to such waiver; and

"(c) Defendant denies that probable cause exists to hold him for trial; and

"(d) Defendant intends to plead not guilty."

Zelenka contends that a remand may take place only under this statute, and that because the instant situation does not fit into one of these categories, that the remand was void as without jurisdiction.[8]

The ultimate failure of the defendant's argument lies in a clear case of waiver. Even if a second full hearing should have been ordered (and defendant presents no

[8] *See also Coleman v. Burnett,* 477 F.2d 1187, 1211 (D.C. Cir. 1973).

good reason why a limited hearing before the same judge cannot in effect be considered an actual second complete hearing given the limited nature of his complaints against the first hearing), it is apparent that the defendant waited too long to object to the remand and waived any objections to jurisdiction.

As noted in *State ex rel. La Follette v. Raskin*, 30 Wis. 2d 39, 45, 139 N.W.2d 667 (1966), a court must possess both personal and subject matter jurisdiction over a defendant in order to try and convict him for a crime.[9] Subject matter jurisdiction generally entails the power of a court to hear a case, determine the facts, apply the law and set the penalty.[10]

Under this definition it is clear that the Dane County Circuit Court had subject matter jurisdiction over this case. See sec. 252.03, Stats.[11] As the trial court had the power to hear and dispose of this case, and because the crime charged in the information was within the court's power, there was subject matter jurisdiction.

---

[9] *See also Walberg v. State*, 73 Wis.2d 448, 458, 243 N.W.2d 190 (1976).

[10] *Organ v. State*, 65 Wis.2d 36, 43, 221 N.W.2d 823 (1974); *Waite v. State*, 57 Wis.2d 218, 226, 203 N.W.2d 719 (1973); *Pillsbury v. State*, 31 Wis.2d 87, 94, 142 N.W.2d 187 (1966).

[11] "252.03 *Jurisdiction of circuit courts.* The circuit courts have the general jurisdiction prescribed for them by the constitution and have power to issue all writs, process and commissions provided therein or by the statutes, or which may be necessary to the due execution of the powers vested in them. They have power to hear and determine, within their respective circuits, all civil and criminal actions and proceedings unless exclusive jurisdiction is given to some other court; and they have all the powers, according to the usages of courts of law and equity, necessary to the full and complete jurisdiction of the causes and parties and the full and complete administration of justice, and to carry into effect their judgments, orders and other determinations, subject to reexamination by the supreme court as provided by law. Said courts and the judges thereof have power to award all such writs, process and commissions, throughout the state, returnable in the proper county."

This leaves only personal jurisdiction as a bar, and generally it appears that jurisdictional errors involving preliminary examinations are concerned with personal jurisdiction. *Flowers v. State,* 43 Wis.2d 352, 366, 168 N.W.2d 843 (1969). Lack of personal jurisdiction may be waived, and this court has specifically held that such waiver occurs when no timely objection is made to the alleged defect and the defendant enters a plea on the information. *State ex rel. La Follette v. Raskin, supra,* 30 Wis.2d at 45.

In this case the defendant pleaded to the information and did not raise any objection to the partial remand until post-verdict motions. Thus it is clear that he waived any jurisdictional objection he might have had.

The defendant next complains that the trial court erred by refusing to compel newsman Michael Fellner to disclose his sources of information on which he based an article in the "underground" newspaper "Take-Over." The article, entitled—"Metro Narcotics Squad Financed Death Deal"—was written by Fellner and others and appeared in the August, 1975 issue of "Take-Over." The article evidently alleged that the Madison Metropolitan Narcotics Squad was aware of the impending deal and supplied money to Posthuma in exchange for a promise to drop impending drug charges against him. When requested to divulge his sources, Fellner invoked a newsman's privilege and refused to answer. The defense contends that this information could have led to a possible entrapment defense.

In *State v. Knops,* 49 Wis.2d 647, 183 N.W.2d 93 (1970), this court held that a journalist had a constitutionally based privilege to refuse to disclose sources of information received in confidence, subject to those cases where the public's need to know could be considered overriding. The defendant contends that *Knops* is no longer

controlling, that no newsman's privilege presently exists because of the United States Supreme Court decision in *Branzburg v. Hayes,* 408 U.S. 665 (1972). The narrow holding of *Branzburg* is that there is no First Amendment privilege which allows a journalist to refuse to testify before a grand jury. The defendant asserts that *Branzburg* should be read broadly to deny the existence of any journalist's privilege under any circumstances.

The state accepts the defendant's assertion that *Branzburg* removes a First Amendment basis for a newsman's privilege, but contends that *Knops* retains validity as an expression of state constitutional law. In *Branzburg,* the court stated:

"It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute." 408 U.S. at 706.

The basis for a Wisconsin constitutional journalist's privilege is contained in Art. I, sec. 3, of the Wisconsin Constitution:

"Every person may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press."

*Knops,* like *Branzburg,* involved a journalist's refusal to divulge confidential information to a grand jury. Furthermore, it is apparent that the finding of privilege in *Knops* was based on the First Amendment, not on Art. I, sec. 3. It is just as apparent, however, that *Knops* could have relied on the Wisconsin Constitution, and that this court can reaffirm *Knops* on that basis, *Branzburg* notwithstanding.

*Branzburg* can be limited to its narrow holding—that there is no First Amendment privilege to refuse to tes-

tify before a grand jury where the journalist had witnessed criminal activity. The *Branzburg* plurality referred to possible privileges in other situations, *e.g.*, drawing a distinction between confidential sources which have actually been engaged in criminal activity and sources which merely have information about the illegal conduct of others. The court intimated that a privilege might exist in the latter case.

As pointed out in the brief *Amicus Curiae* filed in this case, the decision in *Branzburg* must be construed in light of the concurring opinion of Justice POWELL which made a majority decision possible against four dissenters who recognized a First Amendment privilege of either an absolute or qualified nature. Justice POWELL clearly recognizes the existence of a privilege of nondisclosure. He stated that a journalist could claim a privilege, which privilege should then be considered in light of a balancing between freedom of the press and the obligation of citizens to give testimony with respect to criminal conduct. This is comparable to the balancing test adopted by this court in *Knops*—balancing freedom of the press against a compelling and overriding public interest in the information sought.

Since *Branzburg* some courts have taken the position that there is no journalist's privilege. *See, e.g., Dow Jones & Company, Inc. v. Superior Court*, 303 N.E.2d 847 (Mass. 1973); *In re Bridge*, 120 N.J. Super 460, 295 A.2d 3 (1972), cert. den. 410 U.S. 991 (1973). However most courts have interpreted *Branzburg* as recognizing a qualified privilege. *See Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972); *United States v. Liddy*, 478 F.2d 568 (D.C. Cir. 1972); *State v. St. Peter*, 132 Vt. 266, 315 A.2d 254 (1974); *Brown v. Commonwealth*, 214 Va. 755, 204 S.E.2d 429 (1974), cert. den. 419 U.S. 966; *Farr v. Pitchess*, 522 F.2d 464 (9th Cir. 1975), cert. den. 427 U.S. 912 (1976); *Rosato v. Superior Court*, 51 Cal. App.3d 190, 124 Cal. Rptr. 427 (1975), cert. den.

427 U.S. 912 (1976); *Herbert v. Lando*, 568 F.2d 974 (2d Cir. 1977), cert. granted, 46 U.S.L.W. 3577. Most courts have used a balancing test like that proposed by Justice POWELL. On the existence of a qualified privilege under *Branzburg*, see generally: Goodale, *Branzburg v. Hayes and the Developing Qualified Privilege for Newsmen*, 26 Hastings L. J. 709 (1975).

Thus it appears that the privilege recognized by this court in *Knops* and the balancing test therein has continuing validity under both the Wisconsin Constitution and under the United States Constitution even after *Branzburg*. Both the state and *Amicus Curiae* present new variants of the *Knops* test. The state's suggested variant, however, really is not a balancing test but rather a fairly rigid rule borrowed from *United States v. Agurs*, 427 U.S. 97 (1976), a case dealing with the prosecutor's duty to reveal evidence favorable to the defense. There the court held that a defendant's right to a fair trial would be denied only when "the omitted evidence creates a reasonable doubt of guilt that did not otherwise exist." This test was adopted by the Wisconsin court in another case dealing with prosecutorial disclosure, not journalistic privilege. *Ruiz v. State*, 75 Wis.2d 230, 249 N.W.2d 277 (1977).

We conclude that the balancing approach of *Knops*— balancing a privilege of nondisclosure against the societal values favoring disclosure—should be retained.

Applying this test, it is apparent that the trial court did not err in refusing to require Fellner to divulge his sources. Other than the mere suggestion that the information might lead to an entrapment defense, the defendant presents no basis for concluding that he was denied a fair trial or that Fellner's information could have created a reasonable doubt of any sort. Nor does the public's right to know outweigh the privilege; the

information held by Fellner was at best tangential to the case. The issue at trial was whether Zelenka had committed first degree murder. Any information which Fellner might have disclosed would have been, at best, only remotely relevant to the issues at hand.

The defendant's principal contention is that he could not be found guilty of being a party to the crime of first degree murder because he presented a "perfected withdrawal defense." Zelenka argues that although he did know a "rip-off" was to take place, he had no idea that violence would be used or that Posthuma would be killed. Furthermore, he claims that his reaction to the murder—getting sick and attempting to pull Schilling off of Posthuma—indicated a withdrawal from the conspiracy.

The state correctly responds that Zelenka falls short of proving this defense. First, it correctly notes that the jury is not required to believe everything a witness says, particularly when that witness is the sole possessor of the facts at hand and has an interest in the outcome.[12] Here the jury was instructed that the self-interest of the defendant could be considered in weighing his testimony.

Furthermore, there was evidence which pointed toward knowledge that Posthuma would be injured or killed, not merely robbed. Zelenka testified that he was asked by Schilling and Stanton if he would "hit" Posthuma. Although Zelenka claimed that he thought this meant to literally hit Posthuma, the jury could have disregarded this as a self-serving definition of a colloquial term for "kill." This becomes more apparent when it is noted that three witnesses testified that they saw Tom Stanton swaggering around town flashing a wad of money boasting that he was a "hit" man several days after the

---

[12] *See Ring v. State*, 192 Wis. 391, 394, 212 N.W. 662 (1927).

killing. Even if Zelenka thought that "hit" meant to strike a blow to the head, he cannot deny that he knew that violence, possibly fatal violence, was in the offing.

Finally, Zelenka's actions do not demonstrate withdrawal—he simply waited too long for withdrawal to be possible.

" 'A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because of the result either of fear or even of a better motive he concludes to run away at the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced.' " *Pollack v. State*, 215 Wis. 200, 212, 254 N.W. 471 (1934).

*By the Court.*—Judgment and order affirmed.