STATE of Wisconsin, Plaintiff-Respondent,

v.

Vincent E. DYLESKI, Defendant-Appellant.†

Court of Appeals

*No. 89-0815-CR. Submitted on briefs November 2, 1989.—Decided January 9, 1990.*

(Also reported in 452 N.W.2d 794.)

† Petition to review denied.

For defendant-appellant there were briefs by *Jack E. Schairer* and *Donna L. Hintze,* assistant state public defenders.

For plaintiff-respondent there was a brief by *Donald J. Hanaway,* attorney general, and *David J. Becker,* assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J.   Vincent Dyleski, found guilty by a jury of second-degree murder, armed burglary, armed robbery, and theft, appeals his convictions on three grounds. He claims that he was erroneously denied a jury instruction on the defense of coercion; his oral and written statements to Texas authorities while he was a juvenile should have been suppressed; and, finally, the evidence fails to support the robbery conviction because the victim was dead when his property was taken. The trial court denied the coercion instruction on grounds that

Dyleski was a coconspirator; found the statements voluntary; and rejected the victim's death as a defense to robbery. This court affirms.

John Ennis was brutally murdered in the city of Superior in the early morning hours of June 18, 1987. According to statements the sixteen-year-old Dyleski gave to a Houston, Texas, homicide detective, he and two other associates, Randall Rasmussen and Brian Pheil, went to the victim's home about three or four in the morning to get some money. Rasmussen rang the doorbell, got no response and then kicked in the front door. Rasmussen entered and returned to report that Ennis was "passed out" in the bathroom. The three men then entered the house, and Dyleski went to a bedroom to search for money. Rasmussen found a shotgun in the house and hit Ennis over the head, apparently awakening him; Ennis proceeded out of the bathroom, whereupon Rasmussen tackled him and Pheil sprayed Ennis from a large dry-powder fire extinguisher. Rasmussen then beat Ennis over the head with the fire extinguisher. When Ennis continued to resist, according to Dyleski, his associates next strangled Ennis with a vacuum cleaner cord, and finally stabbed him several times with a butcher knife Dyleski had carried into the home. Rasmussen then cut Ennis' throat. A pathologist later determined the cause of death was ligature strangulation and heart failure. The three participants then proceeded to remove guns, beer, money, a police scanner and other property from the home, placed the items in Ennis' car, and drove it away. Pheil drove to his home in Superior, and thereafter Rasmussen drove Dyleski to Houston where some of the stolen property was sold. The two were arrested by a Texas peace officer whose suspicions were aroused when they tried to sell Ennis' 1985 Oldsmobile for $400.

Several hours after his arrest in Houston on June 20, 1987, Dyleski granted a tape-recorded oral interview to Sergeant James Ramsey of the Houston Police Department's Homicide Division commencing at 10:30 p.m. After describing the preceding events surrounding the murder, Dyleski stated: "After that, I wanted to leave. They wouldn't let me leave . . .. Because they wanted me to pretty much be with them and threatened me that they'd kill me . . . if I said anything or took off or—they said I had to go with Randy and leave town . . .. They just told me to start carrying the stuff out." It is this statement upon which Dyleski bases his claim of withdrawal from any conspiracy. Dyleski later gave written statements to Houston police essentially conforming to his oral remarks.[1]

## ABSENCE OF A COERCION INSTRUCTION

Dyleski first claims that the trial court erred by refusing to grant a jury instruction on the defense of coercion. Section 939.46, Stats., provides:

**Coercion.** **(1)** A threat by a person *other than the actor's coconspirator,* which causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the actor or another and which causes him or her so to act is a defense to a prosecution for any crime based on that act, except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide. (Emphasis supplied.)

---

[1] In a later written statement, Dyleski described an incident where they were detained and released by an Oklahoma state trooper for a traffic violation.

Trial courts need give only those instructions the evidence reasonably requires. *State v. Amundson,* 69 Wis. 2d 554, 564, 230 N.W.2d 775, 781 (1975). A coercion defense is inapplicable to cases where the threat is made by the actor's coconspirator. Dyleski, however, maintains that he withdrew from the conspiracy prior to the offenses charged and was therefore entitled to the instruction.

We reject Dyleski's claim of withdrawal as a basis for a coercion defense. The facts presented here are similar to those in *Zelenka v. State,* 83 Wis. 2d 601, 266 N.W.2d 279 (1978). There, the defendant accompanied others for the purpose of robbing a drug peddler. He claimed that he was unaware that the others intended to use violence or that the victim would be killed. He observed the victim being beaten with a hammer and stabbed with a knife, and claimed that he tried to stop the stabbing. The defendant later shared in the proceeds of the robbery. The supreme court held that the defendant did not demonstrate withdrawal:

> [H]e simply waited too long for withdrawal to be possible.

> "A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because, as the result either of fear or even of a better motive, he concludes to run away at the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced."

*Zelenka,* 83 Wis. 2d at 621, 266 N.W.2d at 288 (quoting *Pollack v. State,* 215 Wis. 200, 212, 253 N.W. 560, 565 (1934)). We conclude that the trial court properly exercised discretion when it denied the coercion instruction based upon Dyleski's status as an accomplice or coconspirator.

### STATEMENTS TO TEXAS AUTHORITIES

Dyleski challenges the failure to suppress written statements given Texas police officers. Texas law requires that *written* statements from a detained juvenile include a written waiver of rights by the child's attorney or a waiver in the presence of a magistrate, neither of which occurred here. Dyleski also challenges the admissibility of his *oral* statement to Sgt. Ramsey preceding the written one, on grounds that sec. 48.23(1), Stats., as interpreted in *State v. Woods,* 117 Wis. 2d 701, 733–39, 345 N.W.2d 457, 474–76 (1984), *rev'd on other grounds,* 794 F.2d 293 (7th Cir. 1985), compels court approval of a juvenile waiver once a juvenile petition is filed.

Dyleski relies on *State v. Kennedy,* 134 Wis. 2d 308, 320, 396 N.W.2d 765, 769 (Ct. App. 1986), holding that "[t]he manner and method of obtaining evidence is governed by the law of the jurisdiction in which the evidence is secured." Evidence obtained in violation of the law of the jurisdiction where it is secured is suppressible. Applicable rules of evidence affecting admissibility, in contrast, are those of the forum state. *Id.* at 320-21, 396 N.W.2d at 769.

■

Although Dyleski's written statements apparently violated the Texas statutes, under the *Kennedy* analysis the oral statement to Ramsey was admissible. Texas law

permits oral statements without the necessity of the presence of an attorney or a magistrate. *Woods* and sec. 48.43(1), Stats., are inapplicable to the securing of evidence in Texas. The oral statement was essentially restated in a written one, and therefore the admissibility of the written statement constitutes harmless error. *See State v. Dyess,* 124 Wis. 2d 525, 540–48, 370 N.W.2d 222, 230–34 (1985).

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT ARMED ROBBERY

Finally, Dyleski maintains that because robbery requires taking of property from a person, if Ennis was killed prior to the taking, he was no longer a "person." He points to the provisions of sec. 943.20(3)(d)2, Stats., making theft from a corpse a felony as indicative of the legislative intent to limit robbery to living persons.

The state concedes an absence of Wisconsin case law on this issue, but maintains that the reason for lack of authority to support Dyleski's position is obvious: That position offends common sense. We agree. We adopt the reasoning of other jurisdictions such as expressed in *State v. Fields,* 337 S.E.2d 518, 524–25 (N.C. 1985): "When as here, the death and the taking are so connected as to form a continuous chain of events, a taking from the body of the dead victim is a taking 'from the person.' *See* Am. Jur. 2d, *Robbery* [sec.] 14 at 65 (1985)."

*By the Court.*—Judgment affirmed.