Strafford
No. 81-282

THE STATE OF NEW HAMPSHIRE

v.

BARNEY V. SIEL

March 19, 1982

*Gregory H. Smith*, attorney general (*Peter W. Mosseau*, assistant attorney general, on the brief and orally), for the State.

*Cullity & Kelley*, of Manchester (*John C. Boeckeler* on the brief and orally), for the defendant.

*Orr & Reno*, of Concord (*William L. Chapman* on the brief and orally), for the reporters, Joel Brown and Laura Meade.

BATCHELDER, J. This interlocutory appeal from rulings by the Strafford County Superior Court (*Souter*, J.) presents three questions:

> 1. Whether guarantees against double jeopardy contained in the fifth amendment to the Constitution of the United States and in article 16 of part I of the Constitution of New Hampshire preclude a defendant's retrial for first degree murder and attempted robbery when, in the first trial, there was a variance between the allegations of attempted robbery in the indictments and the evidence of a completed robbery produced at trial.
>
> 2. Whether under the first amendment to the United States Constitution and part I, article 22 of the Constitution of New Hampshire, news reporters have a qualified privilege to withhold the identity of confidential news sources in criminal cases.
>
> 3. Whether the court erred in ruling that a privilege, if it exists, requires the granting of motions to quash subpoenas seeking disclosure of confidential sources in these cases.

This case was presented to the Strafford County Grand Jury and

resulted in indictments at the April, 1980 term charging the defendant with first-degree murder and attempted robbery. The indictments allege that the defendant used physical force on Joseph Woodside during an attempt to commit theft and that the defendant knowingly caused the death of Woodside during an attempt to commit robbery while armed with a deadly weapon.

Trial by jury began on June 16, 1980. The State's evidence tended to establish a completed robbery rather than merely an attempt, as alleged in the indictments. At the close of the State's case, the defendant moved for directed verdicts of acquittal on the ground that there was a variance between the proof and the material allegations of the indictments. The court denied the motion and also denied later motions raising the same issue.

On June 25, 1980, the defendant was found guilty on both indictments and sentenced to life imprisonment without parole. On October 21, 1980, however, the Trial Court (*Goode*, J.) granted the defendant's motion to set aside the guilty verdicts because of an erroneous jury charge and ordered a new trial. On November 12, 1980, the defendant filed a motion to dismiss and for directed verdicts of acquittal on the grounds that double jeopardy prohibited a new trial for first-degree murder and attempted robbery where there was a fatal variance between the material allegations of the indictments and the evidence produced at trial. That motion was heard and denied on March 2, 1981.

In November 1980, defense counsel subpoenaed for the first time two newspaper reporters, Laura Meade and Joel Brown, to appear at a discovery deposition to give evidence relating to articles they had written about drug dealings by Joseph Woodside in Durham and reports that Woodside had been in Durham for about a week before his death. The reporters moved to quash the subpoenas on the ground that they had no personal knowledge of any drug dealings by Joseph Woodside or of his whereabouts during the week prior to his death and on the ground that the information about Woodside had been provided by confidential informants. The reporters claimed the information was privileged from disclosure under the first amendment to the United States Constitution and part 1, article 22 of the New Hampshire Constitution.

Evidentiary hearings on these motions were held on November 19, 1980, and November 26, 1980, and the court granted the reporters' motions to quash, without prejudice, because it was not satisfied that the defendant had exhausted all reasonable alternatives in attempting to obtain the information. Thereafter, the defendant moved for reopening and reconsideration. A further evidentiary

hearing was held on March 2, 1981; and, on June 18, 1981, the court affirmed its earlier order quashing the subpoenas.

It is in the light of this factual background that we discuss the questions transferred.

 The defendant's double jeopardy argument has no merit. A former prosecution will not support a defense of double jeopardy where the trial court has set aside the conviction for proper reasons on the motion of the defendant. *State v. Janvrin*, 121 N.H. 370, 371, 430 A.2d 152, 153 (1981). The defendant raises the question of whether he may be retried on the pending indictments in which attempted robbery is alleged and where, at trial, the State offered proof of a completed robbery. The defendant argues that this constitutes a prejudicial variance. We disagree. This issue was resolved long ago by this court in *State v. Archer*, 54 N.H. 465, 468 (1874), and was recently reaffirmed in *State v. Blake*, 113 N.H. 115, 121, 305 A.2d 300, 304 (1973). These two cases, standing a century apart, dispose of the defendant's argument that the prosecution may not lawfully charge the defendant with the lesser of two felonies despite evidence of guilt of the greater. *See Greenwood v. United States*, 225 A.2d 878, 880 (D.C. App. 1967) ("To compel acquittal [after a conviction for attempt where the completed offense was proved] would result in 'the anomalous situation of a defendant going free not because he was innocent but for the very strange reason that he was too guilty' "). (Citations omitted.) We fail to see how a charge of first-degree murder changes this rule.

The defendant next raises an issue of first impression in New Hampshire. We are called upon to assess and determine the delicate balance between the State and federal constitutional rights of a defendant to have a fair trial, encompassing rights of due process and effective assistance of counsel, on the one hand, and the rights of society to be guaranteed the benefits of a free press on the other. The framers of the federal constitution recognized that the success of the republic depended, to a great extent, upon an informed citizenry, to which end a free press was a necessary prerequisite. The framers also recognized that the rights of an individual citizen to a fair trial should stand on no less firm ground. Accordingly, we seek to locate a position which ensures the protection of both rights.

 At the outset, we note that, where important constitutional guarantees are poised in opposition, the determination of respective rights must be made upon the facts peculiar to each case. The

Bill of Rights in the United States Constitution and the parallel rights earlier expressed in our own State constitution were not intended to be enhanced or diluted by policy-oriented decisions painted in long strokes with a broad brush. Decisions in these sensitive areas must be narrowly based upon the factual posture of each case.

■ Our review of *Branzburg v. Hayes*, 408 U.S. 665 (1972), convinces us that a majority of the justices on the United States Supreme Court recognized that a reporter had a qualified first amendment privilege to protect confidential sources. *Id.* at 691; *id.* at 710 (Powell, J., concurring); *id.* at 746–47 (Stewart, J., dissenting). *But see id.* at 722 (Douglas, J., dissenting) (absolute privilege). Most courts that have analyzed *Branzburg* have reached that same conclusion. *See, e.g., United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980), *cert. denied*, 449 U.S. 1126 (1981); *In re Pennington*, 224 Kan. 573, 574, 581 P.2d at 812, 814 (1978) (reported in P.2d *sub. nom. State v. Sandstrom*), *cert. denied*, 440 U.S. 929 (1979).

■■ Moreover, the New Hampshire Constitution, part 1, article 22, provides a qualified privilege for reporters in civil cases. *Opinion of the Justices*, 117 N.H. 386, 389, 373 A.2d 644, 647 (1977); *see Keene Publishing Corp. v. Cheshire County Super. Ct.*, 119 N.H. 710, 711, 406 A.2d 137, 138 (1979) (privilege to gather news); *cf. Downing v. Monitor Publishing Co., Inc.*, 120 N.H. 383, 386–87, 415 A.2d 683, 686 (1980) (no press privilege when newspaper is a defendant in libel action). We do not believe that, in a criminal case, this State constitutional privilege must cease to exist. But because the individual citizen's civil rights must also be protected, "a news reporter's privilege is more tenuous in a criminal proceeding than in a civil case. . . ." *See In re Pennington*, 224 Kan. at 576, 581 P.2d at 815.

■ We adopt the well-reasoned position that the trial judge developed at length in his rulings and hold that a defendant may overcome a press privilege to withhold a confidential source of news only when he shows: (1) that he has attempted unsuccessfully to obtain the information by all reasonable alternatives; (2) that the information would not be irrelevant to his defense; and (3) that, by a balance of the probabilities, there is a reasonable possibility that the information sought as evidence would affect the verdict in his case.

While the first two prongs of this test are self-explanatory, any definition of the third prong will be inexact. We recognize the need for giving trial judges some guidance, while still preserving

their discretion so that they can deal fairly with the particular situations presented.

■ The third prong requires, first, that the information sought by the defendant must be material, in that it must go to the heart of the case. It must be helpful to the defendant's efforts to disprove an element of the crime, prove a defense, or reduce the classification or gradation of the crime charged. *In re Pennington*, 224 Kan. at 576, 581 P.2d at 815; *Brown v. Commonwealth*, 214 Va. 755, 757, 204 S.E.2d 429, 431, *cert. denied*, 419 U.S. 966 (1974). A matter not material, as here defined, is information sought solely to show a prior inconsistent statement by a witness. *Brown v. Commonwealth*, 214 Va. at 757–58, 204 S.E.2d at 431.

Next, the defendant must show that there is a *reasonable possibility* that the information will affect the verdict. Requiring the defendant to demonstrate a *probability* that the information will affect the verdict would place too severe a burden on him, while allowing the privilege to be overcome by a demonstration of a *mere possibility* that the information will help the defendant would permit mere speculation to displace a constitutionally-grounded privilege.

■ After he is satisfied on the facts then before him that the privilege should fall, the trial judge may also hold an *in camera* hearing with the reporter and, if necessary, with the source before releasing the information to the defendant.

■ The trial court applied the test in the case at hand and, after lengthy evidentiary hearings, found that, although the defense had demonstrated its diligence and that the evidence was relevant, the defendant had not met the third prong of the test. We cannot say that no reasonable person could find as did the trial judge.

The defense of Barney Siel in this case is simply stated. He claims that he did not commit the crime. He goes further. He maintains that some person or persons other than himself had an opportunity and motive to rob and murder the victm. The newspaper reporters, who claim their reporter's privileges in these proceedings, have refused to divulge the sources of material which were published in *the new hampshire* shortly after the crime was discovered. On November 16, 1979, the paper reported under the byline of Laura Meade and Joel Brown that "Woodside was not a university employee or student, and his presence in Durham is still under questioning. Woodside had been seen frequently in Durham in the past week." On November 20, another article appeared in

the same newspaper under the byline of Laura Meade, which in part contained the following information: "A source close to the investigation said he was convinced the murder was premeditated . . . probably motivated by robbery. The source also said that Woodside was dealing with drugs while in town . . . either to sell or buy."

The trial court made the following findings and observation:

> "Defendant seeks the identity of the reporters' informants in this case to strengthen his claim that others in Durham would have had an opportunity to learn that Woodside carried drugs or money, or dealt in drugs. On the basis of such evidence he would argue that other persons had an opportunity and motive to rob for the money or drugs, whether simply to obtain them or in revenge for unsatisfactory dealings. I should note that defendant seeks the identity of the sources solely as a means of leading him to such evidence. There is no basis on the record that would suggest that the sources, or any of their sources, could provide more definite evidence that any other person did in fact have such motives or did in fact kill Woodside."

We cannot say that the trial judge was incorrect in his determination that the defendant could not sustain the burden of showing that the information sought would affect the verdict. That Woodside was in Durham rather than Keene during the week prior to his death, as the bulk of the evidence suggests, does not, in and of itself, help the defense. Nor does the information that another source believed that the murder was premeditated, motivated by robbery. And the statement that this source believed that Woodside was in town to buy or sell drugs does not show that the source had any knowledge of the identity of any person or persons who would have had a motive to kill the victim. We appreciate the defendant's position, but while these statements do raise a suspicion that the sources might have further information that would aid him, it does not rise to the level of certainty needed to overcome the reporters' privilege.

The trial judge was further aided by the unusual procedural posture in which this case arose. There had already been a trial on the merits that had resulted in a guilty verdict. Although the verdict had been set aside for reasons not connected with the issues before us, the transcript of the earlier trial was available to the trial judge to aid him in his rulings on the motions to quash the subpoenas. Before him was a record more fully developed than

that usually presented to most judges, who must rule on these questions at a preliminary stage where the factual record will be sparse. The opportunity of the trial judge to review the transcripts of the earlier trial, which he in fact did, provided him with a far better background against which he could make his decision.

The fact that the defendant had already been found guilty of the crime in the earlier trial underscores the importance of the defendant's arguments in this matter. The trial judge and this court were thus made particularly sensitive to the defendant's need for exculpatory information which he sought to develop after the first trial.

The rulings of the trial court are accordingly affirmed.

*Affirmed; remanded.*

All concurred.