700 P.2d 40

**In the Matter of CONTEMPT OF Court by Jim WRIGHT, Appellant.**

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Gary KISS, Defendant-Respondent.**

No. 15091.

Supreme Court of Idaho.

April 29, 1985.

Charles A. Brown, Lewiston, for appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, and Richard George Whitehead, Lewiston, for plaintiff-respondent.

HUNTLEY, Justice.

By this appeal we are asked to determine whether there exists under the United States or the Idaho Constitution a newsperson's qualified privilege to refuse to disclose confidential sources. We hold there is such a *qualified* privilege under the First Amendment to the United States Constitution and Art. I, § 9 of the Idaho Constitution. We reverse and remand to the trial court for further proceedings consistent with this opinion.

This case arose when Jim Wright, reporter for the Moscow, Idaho, Daily Idahonian, refused to disclose the name of a confidential source he had interviewed in the course of writing an article about marijuana growing. The criminal defendant, Gary Kiss, had been charged with felony manufacture and possession of a controlled substance based solely on the word of Lewis, one of Kiss' co-defendants. The State wanted Wright to corroborate Lewis' testimony against Kiss so that the State could meet its evidentiary burden under I.C. § 19-2117, which provides:

> **19-2117. Testimony of accomplice—Corroboration.—**
>
> A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.

The district court held a hearing to receive testimony from Wright as to whether he would disclose his source. He refused, stating that he had written the article to uncover the inadequacies and falsity of police reporting in marijuana raids. He also said he had promised his source confidentiality, and that he believed he would not have gotten the information had he not promised the grower confidentiality.

The district court found no absolute or qualified privilege to excuse Wright from testifying. It found Wright in contempt, and fined him $500 a day, that fine being stayed pending this appeal.

Wright appealed, contending that compulsion of his disclosure of a confidential source without appropriate hearing to evaluate his claim of privilege was in violation of the First Amendment, and of his due process rights under the Fourteenth Amendment of the U.S. Constitution. Rather than an absolute privilege, Wright seeks a privilege qualified by application, in a separate hearing, of a balancing test. The test would encompass consideration of (1) the relevancy of the information compelled; (2) whether the information is critical to the State's claim, and (3) whether there are alternative sources for the information sought to be compelled. This Court accepted the appeal for plenary review.

## BACKGROUND

Reporters maintain that successful investigative reporting requires the ability to maintain confidential sources. That belief has been incorporated in the American Newspaper Guild's Code of Ethics: "Newspapermen shall refuse to reveal confidences or disclose sources of confidential information in court or before judicial or investigative bodies." *See,* P. Marcus, The Reporter's Privilege: an Analysis of the Common Law, Branzburg v. Hayes and Recent Statutory Developments, 25 Arizona L.R. 815 (1983). Without confidential sources, reporters argue, many informants, sensitive to threats of exposure, would be silenced. Not only newspeople, but the public as well would suffer the resulting loss of information.

This Court, and many others, have acknowledged reporters' concerns, and more importantly, public interest in the need for effective investigative reporting. In *Marks v. Vehlow,* 105 Idaho 560, 671 P.2d 473 (1983), we noted our basic agreement with this statement from *Zerilli v. Smith,* 656 F.2d 705, 711 (D.C.Cir.1981):

> Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices.... [T]he press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired. Compelling a reporter to disclose the identity of a source may significantly interfere with his news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant. (Footnotes omitted.)

Compelling a reporter to disclose the identity of a confidential source clearly raises First Amendment considerations. The First Amendment guarantees a free press in large part because of the important role it can play as "a vital source of public information." *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936).

In his dissenting opinion in *Caldero v. Tribune Publishing Co.*, 98 Idaho 288, 562 P.2d 791 (1977), *cert. denied*, 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977), Chief Justice Donaldson asserted that every case involving an infringement of First Amendment rights raises the question of whether there is a compelling interest justifying the infringement. A First Amendment case necessarily involves the balancing between the competing interests of maintaining a strong First Amendment and the interest asserted as justifying the impairment of First Amendment freedoms. The balance, he stated, is weighted in favor of the First Amendment—the competing interest must be "compelling" or "paramount". *Caldero, supra* at 298, 562 P.2d 791.

In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the United States Supreme Court, in a plurality opinion, held that a journalist has no absolute privilege under the First Amendment to refuse to disclose confidential sources to a grand jury conducting a criminal investigation. The Court recognized, however, that news gathering does have some First Amendment protection, and that in certain circumstances, such as in a bad faith investigation or official harassment, a newsperson would have a qualified privilege even before a grand jury. Justice Powell, casting the deciding vote for the majority, wrote a concurring opinion which recognized that courts may determine whether a privilege exists by applying a balancing test:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions. *Branzburg, supra*, 408 U.S. at 710, 92 S.Ct. at 2671.

Justice Powell emphasized the limited nature of the majority holding, *id.* at 725, 92 S.Ct. at 2671; in fact, the majority specifically limited its holding to the issue of "the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." *Id.* at 682, 92 S.Ct. at 2657.

The District of Columbia Circuit took the opportunity in *U.S. v. Liddy*, 478 F.2d 586 (1972), shortly after the *Branzburg* decision, to analyze Justice Powell's opinion. Judge Leventhal stated:

> .... I begin with the premise that the *Branzburg* decision is controlled in the last analysis by the concurring opinion of Justice Powell (408 U.S. at 709, 92 S.Ct. at 2670) as the fifth Justice of the majority. That opinion holds, as I understand it, that there is no universal constitutional privilege of a newsman to keep confidential the identity of his sources and the content of their revelations. The assertion of that privilege may, however, come to involve a question under the First Amendment freedom of the press, and in such case there will be need for balancing that assertion against the need for the material in the interest of society, as in a case where a newsman has "rea-

son to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement." (p. 710, 92 S.Ct. at 2671). That does not require a demonstration of either total lack of legitimacy or utter lack of any possible need, for it may be raised on a claim that the information desired of the newsman has only a "remote" relationship to the subject of the investigation. As to the conduct of the balancing test, Justice Powell made it clear that the judge is "free to balance the competing interests on their merits in the particular case." *Id.* at 586–7.

The now widely accepted view of *Branzburg* appears to be that it was limited by the specific facts presented by the consolidated cases, and that a case-by-case analysis must be used in "balancing freedom of the press against a compelling and overriding public interest in the information sought." *Zelenka v. State,* 83 Wis.2d 601, 266 N.W.2d 279, 287 (1978). *See also, Riley v. City of Chester,* 612 F.2d 708, 714 (3rd Cir.1979); *Farr v. Pitchess,* 522 F.2d 464, 467 (9th Cir.1975) *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976); *State v. Siel,* 122 N.H. 254, 444 A.2d 499, 502 (1982); *State v. Sandstrom,* 224 Kan. 573, 581 P.2d 812, 814–15 (1978) *cert. denied,* 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979); *Gadsden County Times, Inc. v. Horne,* 426 So.2d 1234 (Fla. App. 1 Dist.1983); Marcus, *supra,* at 838; Comment, The Newsman's Privilege After Branzburg, The Case for a Federal Shield Law, 24 UCLA 160, 172–74 (1976).

Courts finding a qualified privilege generally have applied a balancing test similar to one proposed by Justice Stewart in his *Branzburg* dissent. *See, e.g. United States v. Burke,* 700 F.2d 70, 77 (2nd Cir. 1983) *cert. denied,* — U.S. —, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir.1980) *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *WBAL-TV Div., Hearst Corp. v. State,* 300 Md. 233, 477 A.2d 776, 781 (1984). That test consists of the following elements:

(1) Whether there is probable cause to believe that the newsperson has information that is clearly relevant to a specific probable violation of law;

(2) Whether the information sought cannot be obtained by alternative means less destructive of First Amendment rights;

(3) Whether there is demonstrated a compelling and overriding interest in the information. *Branzburg,* 408 U.S. at 744, 92 S.Ct. at 2681.

Procedural requirements for the evaluation process vary: many courts hold an in-camera hearing with a reporter and sometimes even with a source; others establish stringent burdens of proof with requirements of specific findings in the record and opportunity for immediate appeal. *See e.g., State v. Siel, supra; In re Farber,* 78 N.J. 259, 394 A.2d 330 (1978) *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Wisconsin ex rel. Green Bay Newspaper v. Circuit Court,* 9 Med. Law Rptr. 1889 (1983). Our trial judges are well qualified to select the procedure to fit the circumstances, but specific findings should be provided in all cases to facilitate review.

**IDAHO CASES**

In *Mark's, supra* we stated:

> We view this case as presenting a unique set of circumstances—a habeas corpus proceeding in which a journalist is a witness. Because we find a compelling and legitimate governmental interest in assuring the efficacy of the writ of habeas corpus, we hold that here there is no qualified newsman's privilege beyond the usual inquiry concerning relevance and materiality of the information sought....
>
> ....
>
> ... We therefore decline to establish a specific newsman's privilege with respect to such information. (Footnotes omitted.) 105 Idaho at 568–569, 671 P.2d 473.

We did not there preclude the finding in other circumstances of a qualified privilege

as the result of a case-by-case balancing process. *In Sierra Life v. Magic Valley Newspapers, Inc.,* 101 Idaho 795, 623 P.2d 103 (1980) and *Caldero, supra,* the issue of a newsperson's privilege arose in the context of a libel action. We stated in *Sierra:*

> We recognize that the news media rely upon confidential sources in the preparation of many stories, particularly those involving government or large organizations. The ability to keep the identity of those sources confidential is not infrequently a prerequisite to obtaining information. This interest, while legitimate, is not so paramount that the legitimate discovery needs of a libel plaintiff must bow before it. But by the same token a trial court can be expected to exercise caution when it orders these sources to be revealed. As the Supreme Court of the United States has suggested, the first question to be answered is whether the identity of the sources is *relevant.* In *Caldero,* the very crux of the case was whether or not the "police expert" actually existed, and whether or not he said that which the newspaper published. Relevance was there established beyond quibble. *Sierra,* 101 Idaho at 801, 623 P.2d 103.

The dissenters in *Caldero* stated that the interest in compelling testimony could be balanced differently in a civil action than in a criminal matter. *Caldero,* 98 Idaho at 299, 562 P.2d 791. Commentators have pointed out that in a civil setting, courts are more reluctant to require disclosure. *See, e.g., Marcus, supra* at 850–51. An exception to that statement appears to occur in two situations:

(1) Where a reporter is a plaintiff making allegations of wrongdoing against defendants; *see e.g. Anderson v. Nixon,* 444 F.Supp. 1195 (D.C.Cir.1978).

(2) Where a newsperson, paper or publisher is the defendant in a defamation action. *See Senear v. The Daily Journal-American,* 97 Wash.2d 148, 641 P.2d 1180 (1982).

It might be noted that these situations could be viewed not as exceptions to a general rule of privilege, but as circumstances in which the balancing favors disclosure, since the source or information at issue may be so relevant and material as to be at the very heart of the claim. *See, Garland v. Torre,* 259 F.2d 545 (2d Cir.) *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). If the source or information is also not available elsewhere, and of overriding interest to the moving party, then Justice Stewart's balancing test has been met. While *Caldero* has been read as refusing to find either an absolute or qualified privilege, it more properly can be seen as a case in which there was implicit balancing, with the result being that the need for the identity of a source there outweighed the First Amendment interest. To the extent that *Caldero* holds that under no circumstances is there a qualified newsperson's privilege in Idaho which is protected by the First Amendment of the U.S. Constitution, we decline to follow it as precedent. Since *Caldero* there has been an increasing recognition by federal and other state courts, as well as state legislatures which have passed "shield laws" (26 to date),[1] of the connection between freedom of the press and the public's right to know. A careful balancing by the courts between a First Amendment privilege, and any interest asserted which may conflict with that privilege, will serve the parties and the public most appropriately.

We hold that the elements of Justice Stewart's balancing test in *Branzburg* are the proper ones to be used. This test may be applied in both a criminal and a

1. The following states have Shield Laws which provide a newsperson's privilege:

Alabama, Alaska, Arizona, Arkansas, Louisiana, Maryland, Michigan, Minnesota, New York, North Dakota, Ohio, Oklahoma, California, Delaware, Illinois, Indiana, Kentucky, Montana, Nebraska, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Tennessee

civil context; however, the weight given to each factor will vary depending on the type of case and the interest at issue. In a criminal matter where, for example, the defendant asserts a Sixth Amendment right to a fair trial to compel disclosure, the weight of such a constitutional interest may tip the balance in favor of disclosure. In a civil matter, disclosure will not be compelled absent a showing of a significant interest by the moving party supported by the balancing test elements.

A balancing test such as we adopt will not adversely affect a criminal or civil trial or even a grand jury process. Many states had adopted such a test by statute as early as 1971 with no apparent disruption of the investigative process. *See* Comment, The Newsman's Privilege After *Branzburg;* The Case for a Federal Shield Law, 24 U.C.L.A. L.Rev. 160, 167 (1976). Moreover, we reiterate that such a balancing test does not contemplate an absolute immunity; if the material is relevant, unavailable from other sources, and of significant interest in an investigation or case, the reporter will be compelled to divulge sources and information.

Art. I, § 9 of the Idaho Constitution provides for protection of freedoms substantially similar to those of the First Amendment to the U.S. Constitution. Accordingly, for the reasons discussed above, we also ground this decision on the mandates of the Idaho Constitution.

We reverse and remand to the trial court for appropriate proceedings consistent with this opinion.

No attorney fees. Costs to appellant.

DONALDSON, C.J., and BAKES and BISTLINE, JJ., concur.

DONALDSON, Chief Justice, specially concurring.

While I am in basic agreement with the majority opinion, I must express the following reservations. First, the majority grounds its decision on the United States Constitution and the Idaho Constitution. In my opinion it is error to ground the decision on the United States Constitution. After *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the federal constitutional status of the newsperson's privilege is anything but clear. *See, e.g., Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *New York Times Co. v. Jascalevich,* 439 U.S. 1331, 99 S.Ct. 11, 58 L.Ed.2d 38 (1978); *New York Times Co. v. New Jersey,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).

Instead, relying on the United States Supreme Court's invitation in *Branzburg* for state courts "to [respond] in their own way and [construe] their own constitutions so as to recognize a newsman's privilege, either qualified or absolute," (408 U.S. at 706, 92 S.Ct. at 2669) I would ground this decision wholly on Art. 1, § 9 of the Idaho Constitution. Art. 1, § 9 provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty." Our own state constitutional history concerning the intent of the drafters of this section is sparse. *See* Constitutional Convention Proceedings, Vol. I, at 279–81; Vol. II, at 1594–95, 1636–37. However, in construing a nearly identical provision, the Supreme Court of California noted that

> "[t]he quoted position is an almost exact duplicate of Art. VII, § 8 of the New York Constitution of 1821. Substantially the same language is found in the constitutions of 43 states. Chafee, Free Speech in the United States, p. 5, n. 2. The remaining states have a shorter guarantee similar to that in the United States Constitution, in which the 'abuse' exception has been necessarily implied." *Werner v. Southern California Associated Newspapers,* 35 Cal.2d 121, 123, 216 P.2d 825, 827 (1950).

The court concluded that this provision's "primary purpose is to guarantee that freedom of speech shall not be restrained ex-

*See,* Comment, *supra,* 24 U.C.L.A. L.Rev. 160, 167 (1976).

cept to prevent abuse." at 123, *Id.* 216 P.2d at 827.

Therefore, any analysis under this section will necessarily involve a balancing of competing claims. As I explained in my dissent in *Caldero v. Tribune Pub. Co.*, 98 Idaho 288, 298, 562 P.2d 791, 801 (1977), *cert. denied*, 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977), the interest in maintaining a robust freedom of speech must be balanced against whatever interest is asserted as justifying the impairment of free speech. The balance, however, is weighted in favor of free speech in that the competing interest must be "compelling" or paramount. While the State's interest in compelling disclosure of confidential sources which may lead to the prosecution of crime may be great, "[w]hether a court should require disclosure in the individual case will depend upon the facts of the case. Disclosure cannot be dictated in the abstract. The issue must be resolved on a case-by-case basis...." *Caldero, supra,* at 305, 562 P.2d at 808. To assist a court in making such a determination, I suggested an approach which balances the availability of alternate sources, the relevancy of the material sought and the critical import of that information. *Id.* at 304, 562 P.2d at 807.

I have consistently maintained this position in the privilege cases subsequent to *Caldero.* In *Sierra Life Ins. v. Magic Valley Newspapers,* 101 Idaho 795, 623 P.2d 103 (1981), I joined the majority opinion which stated: "But by the same token a trial court can be expected to exercise caution when it orders these sources to be revealed. As the Supreme Court of the United States has suggested, the first question to be answered is whether the identity of the sources is *relevant.*" *Sierra Life, supra,* at 801, 623 P.2d at 109. This statement implies that further questions, for example, materiality and exhaustion of other sources, are appropriate when considering whether confidential sources must be revealed. In *Marks v. Vehlow,* 105 Idaho 560, 671 P.2d 473 (1983), I wrote for the majority which recognized the existence of a qualified privilege by quoting the above language from *Sierra Life,* by finding a compelling justification for the disclosure and by citing my dissent in *Caldero* as authority for the proposition that the trial court must determine relevancy and materiality of the information sought. Additionally, that opinion specifically limited its holding, finding no privilege, to the specifics of that case.

My second reservation with the majority opinion concerns the procedures for determining whether the privilege applies in a given case. The newsperson in this case, Jim Wright, claims that his constitutional due process rights entitle him to a separate hearing to determine his privilege claim. The majority opines that "our trial judges are well qualified to select the procedure to fit the circumstances." Then, the majority remands the case to the trial court for appropriate proceedings consistent with the opinion leaving it unclear whether Wright is entitled to a separate hearing. My interpretation of "proceedings consistent with the opinion" is that Wright is not constitutionally entitled to a separate hearing but rather is only entitled to that procedure selected by the trial judge to fit the circumstances.

Accordingly, I concur in that part of the opinion that rests its decision on ID. CONST. art 1, § 9 and that remands the case to the trial court to apply the test set out by the majority in a procedure selected by the trial court.

BISTLINE, Justice, specially concurring.

I.

While I agree with Justice Huntley that under the United States and Idaho Constitutions there does exist a newsperson's qualified privilege not to disclose confidential sources, we need not have reached this conclusion, for there is also a common law privilege co-extensive to the constitutional privilege announced by the Court today.

It is a fundamental principle of law that when a court can decide a case on non-constitutional grounds, it should do so. *State v. Hightower,* 101 Idaho 749, 757, 620 P.2d

783, 791 (1980); *Erickson v. Amoth,* 99 Idaho 907, 910, 591 P.2d 1074, 1077 (1978). We can and should do so here.

The common law, so far as it is not inconsistent with the constitutions and laws of either the United States or Idaho, is the law of this state. I.C. § 73–116. It is judge-made law based upon reason and common sense. The common law is not immutable; rather, it is "a flexible legal system capable of expansion and change necessary to meet new and changed problems and conditions, or to meet a new or altered public policy evolving from such changed conditions in an expanding and developing social order." *Good v. Good,* 79 Idaho 119, 124, 311 P.2d 756, 758–59 (1957). *See also Senear v. Daily Journal-American,* 97 Wash.2d 148, 641 P.2d 1180, 1182 (1982) ("Common law is not static."); *Funk v. United States,* 290 U.S. 371, 383, 54 S.Ct. 212, 216, 78 L.Ed. 369 (1933) ("It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions.")

Thus, when a case is not governed by statutory law, as is true in this case, it is this Court's duty to then apply the common law in light of present-day society to determine the outcome of the case. Accordingly, it is to the common law I turn.

II.

The concept of privileges arose in England in the 1600's. It developed only after witnesses could be compelled to testify. In England prior to the fifteenth century the concept of a witness was non-existent, for the jury served both as trier of fact and witness. 8 J. Wigmore, *Evidence in Trials at Common Law* § 2190, at 62 (McNaughton rev. ed. 1960). This method proved inefficient, and over time the bifurcation of witness and jury duties developed. *Id.*, pp. 63–65.

As the bifurcation of witnesses and juries occurred, new problems arose, the chief one being that there was no way for a court to require a witness to appear and give testimony. *Id.* This shortcoming was remedied by the Statute of Elizabeth in "which a penalty was imposed and a civil action was granted against any person who refused to attend (and testify) after service of process and tender of expenses." *Id.*

This statute is the source of the maxim that "the public ... has a right to every man's evidence." *Id.*, § 2192, at 70; *see also Caldero v. Tribune Publishing Co.,* 98 Idaho 288, 291, 562 P.2d 791, 794 (1977). It was after the statute was enacted and the possibility of testimonial compulsion became a reality that the concept of privilege arose. Sherman and Weiser, *The Privilege Study: An Empirical Examination of the Psychotherapist-Patient Privilege,* 60 N.C. L.Rev. 895, 904 (1982).

Originally, the basis for a privilege was in the notion of "honor among gentlemen." 8 Wigmore, *supra,* § 2286, at 530.[1] The "honor among gentlemen" basis for privileges, however, was rejected in the 1776 case of Duchess of Kingston's Trial, 20 How.St.Trials 573 (1776), cited in *McCormick on Evidence,* § 98 at 212 (2d ed. 1972), in which the court refused to recognize a physician-patient privilege that was based simply upon the physician's honor not to divulge his confidences.[2] A primary result of *Duchess of Kingston's Trial* was that the "honor among gentlemen" basis for justifying a privilege was replaced by a stricter utilitarian standard based on strong policy grounds. 8 Wigmore, *supra,* § 2286, at 531.

1. For example, the attorney-client privilege arose out of an attorney's honorable obligation not to disclose information confided by a client. *Id.*, at 531.

2. Mr. Chief Justice Mansfield said in part:

   If a surgeon was voluntarily to reveal these secrets, to be sure, he would be guilty of a breach of honor and of great indiscretion; but to give that information in a court of justice, which by the law of the land he is bound to do, will never be imputed to him as any indiscretion whatever.

   *Id.*

Based upon this stricter utilitarian standard, Professor Wigmore has formulated what he believes to be the four requirements for a privilege to be recognized at common law:

> (1) The communications must originate in a *confidence* that they will not be disclosed.
>
> (2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.
>
> (3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*
>
> (4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of the litigation. *Id.* § 2285, at 527 (emphasis original).

Many courts and commentators have accepted Wigmore's test as the proper method for determining if a proposed privilege ought to be recognized. *See, e.g., Senear, supra,* 641 P.2d at 1182; *Allred v. State,* 554 P.2d 411, 417 (Alaska 1976); Slovenko, *Psychiatry and a Second Look at the Medical Privilege,* 6 Wayne L.Rev. 175, 184–99 (1960). It must always be remembered, however, that proper application of this test depends upon a correct understanding of the reason for privileges, which is "that in the balance of human liberty, more is achieved by safeguarding certain relationships from state molestation than is lost through the resulting impediment to the fact finding process." Louisell and Sinclair, *Forward: Reflections on the Law of Privileged Communications,* 59 Cal.L. Rev. 30, 53–54 (1971).

III.

Applying Wigmore's test, it is indisputable that in light of the needs of present-day society there does exist in the common law a qualified journalistic privilege.

Wigmore's first two requirements—confidence that a communication will not be disclosed, and that this confidentiality is essential to the maintenance of the relation between the parties—are normally present to justify recognition of a journalistic privilege. They certainly are present in this case.

Wigmore's third requirement, while perhaps in prior times unsatisfied, is met in today's world. The role of "an untrammeled press as a vital source of public information," *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936), in today's world is of upmost importance. Today's society is complex and diverse, and the need for citizens to receive adequate information in order to make considered, reasonable decisions within the democratic process is crucial:

> Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices.... [T]he press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired. Compelling a reporter to disclose the identity of a source may significantly interfere with his news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant. *Zerelli v. Smith,* 656 F.2d 705, 709, 711 (D.C.Cir. 1981), as quoted with seeming approval by the majority in *Marks v. Vehlow,* 105 Idaho 560, 568, 671 P.2d 473, 481 (1983).

True today, too, is the increasing reliance the citizenry places upon the media and journalists in particular as sources of information. Accordingly, the confidential relationship between journalist and informant is one today that ought to be "sedulously fostered."

Wigmore's fourth requirement is interrelated to the third requirement set out above. The compelling interest at stake is the interest in allowing the press unfettered access to sources of information in order that the citizenry may become better informed about what is happening around them. This interest is extremely important. It was James Madison who said: "A popular government, without popular infor-

mation or the means of acquiring it, is but a prologue to a farce or a tragedy; or perhaps both.... And a people who mean to be their own governors must arm themselves with the power knowledge gives." Letter by James Madison to W.T. Barry, August 4, 1822, found in 9 Writings of James Madison 103 (G. Hurst ed. 1910).

The resultant injury from having a poorly informed public is inestimable. Professor Alexander Meiklejohn points this out well:

> Just so far as, at any point, the citizens who are to decide an issue are denied acquaintance with information, or opinion, or doubt, or disbelief, or criticism, which is relevant to that issue, just so far this result must be ill-considered, ill-balanced planning for the general good. A. Meiklejohn, *Political Freedom: The Constitutional Powers of the People* 27 (1960).

Accordingly, the injury from failing to recognize a common law journalist privilege would be greater than the benefit gained by requiring testimony in all instances. *Senear, supra,* 641 P.2d at 1183. This is especially true in light of the fact that the privilege to be recognized is a *qualified* privilege, which will not always attach in every single case. Applying Wigmore's four-part test, it is readily apparent that a common law journalist privilege exists and should be so recognized in Idaho.

IV.

I concur with the Washington Supreme Court's determination that, although a journalist's privilege does exist at common law, it is a qualified one that can be defeated if certain conditions are met:

> First, there must be a showing that the claim is meritorious; *i.e.,* it must not be frivolous or brought for the purpose of harassing the reporter. *Branzburg v. Hayes,* 408 U.S. 665, 710, 92 S.Ct. 2646, 2671, 33 L.Ed.2d 626 (1972) (Powell, J., concurring); *Winegard v. Oxberger, supra* [258 N.W.2d 847 (Iowa 1977)].
>
> Second, the information sought must be necessary or critical to the cause of action or the defense pleaded. It must, as was stated by Judge (later Justice) Potter Stewart, go "to the heart of the plaintiff's claim". *Garland v. Torre,* 259 F.2d 545, 550 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). *See also Carey v. Hume,* 492 F.2d 631, 636–37 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Zerilli v. Smith,* 656 F.2d 705, 7 Media L.Rptr. 1121, 1127 (D.C.Cir.1981); *Baker v. F & F Inv.,* 470 F.2d 778, 783–84 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).
>
> Third, a reasonable effort must be made to acquire the desired information by other means. Even when the information is critical and necessary to plaintiff's case, the plaintiff must exhaust reasonably available alternative sources before a reporter is compelled to disclose.
>
> > The values resident in the protection of the confidential sources of newsmen certainly point towards compelled disclosure from the newsman himself as normally the end, and not the beginning, of the inquiry.
>
> *Carey v. Hume, supra* at 638 (concluding after balancing the interests that the reporter must disclose confidential sources); *see also Riley v. City of Chester, supra* [612 F.2d] at 717 [(3d Cir. 1979)]; *Baker v. F & F Inv., supra* at 784. *City of Chester, supra* at 717; *Baker v. F & F Inv., supra* at 784. *Senear, supra,* 641 P.2d at 1183–84.

Thus, whether the privilege will attach in a particular case will depend upon the facts of that case. Determining whether the privilege will apply should be done in an in-camera hearing before the district court.

Relating to the above three factors discussed in *Senear,* it should be noted that in criminal cases[3] a *defendant's right* to a fair trial is a more compelling interest in favor of disclosure than a civil litigant's

3. The Washington Supreme Court in *State v. Rinaldo,* 102 Wash.2d 749, 689 P.2d 392 (1984) held that there exists a common law privilege in criminal as well as civil cases.

right. That is contrasted, however, to instances such as this case where it is the *state* seeking the information. While the state's interest in acquiring information concerning criminal conduct is important, it is not so important as to justify allowing it to, in effect, require private parties in all instances to do the investigatory work it has the responsibility of doing by demanding, upon threat of fine or incarceration, information acquired by private parties through private efforts. One final note, a journalist should receive greater protection if he or she is not a party to the case.

V.

The common law is a dynamic body of law. It is not something etched in stone—a strait jacket immune to change. It is capable of growth, evolution, and adaptation. It should change as intellectual, societal, economic, and cultural conditions change.

Today's world of democracy demands information as never before. It is that fact that leads to the inescapable conclusion that a common law journalist privilege does exist. I would accordingly so hold.

BAKES, Justice, concurring specially:

I concur in the result reached by the majority opinion. As I stated in a dissenting opinion in *Caldero v. Tribune Publishing Co.*, 98 Idaho 288, 562 P.2d 791 (1977), "the First Amendment to the United States Constitution affords a newsman a limited privilege against disclosure of his news sources in some cases." However, that qualified privilege exists solely by virtue of the interpretation placed upon the first amendment of the United States Constitution by the Supreme Court of the United States and other federal courts, and for no other reason. I disagree with the majority opinion in this case that such a privilege exists under Art. 1, § 9, of the Idaho Constitution, and also disagree that such a privilege existed at common law.

SHEPARD, Justice, dissenting.

The Court today fashions from thin air a new evidentiary privilege which effectively allows an amorphous, undefined class of persons to refuse to testify in court. The majority does not limit the privilege or tell us its extent. The majority postulates no rationale for its decision, other than the vague assertion that it is founded in freedom of the press.

The majority finds no agreement within itself as to the basis of its holding. Huntley, J., with whom Bakes, J., concurs, surmises that the privilege grows out of the federal constitution. Donaldson, C.J., and Huntley, J. suggest that the privilege arises from Idaho's constitution. Bistline, J., plucks the privilege from the common law, where it has evidently slumbered unnoticed through the centuries.

The majority suggests that a successful assertion of the privilege will depend upon a "balancing" test, but I perceive that "balancing" as a thinly-veiled predicate for ad hoc decisions with no true legal foundation. Society and its system of criminal law will be ill-served by decisions which at bottom state, "it all depends," "that's different," or candidly, "our inability to withstand pressure has foreordained the result, hence there is no importance to how we arrive at that result."

There is only one conceivable rationale for the testimonial privilege created by the majority today, which rationale is that there is a constitutional protection of the freedom of the press; that such constitutional protection extends to the right of the press to not only disseminate news but to gather news; and that if a member of the press is required to testify in court regarding information obtained during news gathering, there will be a chilling effect on the freedom to publish news. That precise rationale was addressed and demolished by White, J., in *Branzburg v. Hayes*, 408 U.S. 665, 698–699, 92 S.Ct. 2646, 2665, 33 L.Ed.2d 626 (1972):

> "We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history

teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press."

The Court went on to say, 408 U.S. at 702–703, 92 S.Ct. at 2667–2668:

"If newsmen's confidential sources are as sensitive as they are claimed to be, the prospect of being unmasked whenever a judge determines the situation justifies it is hardly a satisfactory solution to the problem. For them, it would appear that only an absolute privilege would suffice.

"We are unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination."

The problem of exactly who constitutes the "press" and to whom the testimonial privilege will be extended was also pointed out in *Branzburg* as a factor requiring the rejection of the asserted privilege. The Court stated, 408 U.S. at 703–704, 92 S.Ct. at 2668:

"The administration of a constitutional newsman's privilege would present practical and conceptual difficulties of a high order. Sooner or later, it would be necessary to define those categories of newsmen who qualified for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photo composition methods."

The Oregon Supreme Court in *State v. Buchanan*, 250 Or. 244, 436 P.2d 729, 731–732 (1968), put it as follows:

"Apart from the definitional difficulties in attempting to give constitutional status to a privilege for qualified news gatherers which presumably would be denied to less favored classes, there is another objection to discrimination between news gatherers and other persons. Such a practice would be potentially destructive of the very freedom that is sought to be preserved by this appeal. After the lessons of colonial times, the First Amendment required the federal government to resist the normal temptation of rulers to regulate, license, or otherwise pass upon the credentials of those claiming to be authors and publishers. An invitation to the government to grant a special privilege to a special class of 'news gatherers' necessarily draws after it an invitation to the government to define the membership of that class. We doubt that all news writers would want the government to pass on the qualifications of those seeking to enter their field.

* * * * * *

"Assuming that legislators are free to experiment with such definitions, it would be dangerous business for courts, asserting constitutional grounds, to extend to an employe of a 'respectable' newspaper a privilege which would be denied to an employe of a disreputable newspaper; or to an episodic pamphleteer; or to a free-lance writer seeking a story to sell on the open market; or, indeed, to a shaggy nonconformist who wishes only to write out his message and nail it to a tree. If the claimed privilege is to be found in the Constitution, its benefits cannot be limited to those whose credentials may, from time to time, satisfy the government."

Simply stated, there is no coherent or reasonable rationale for the decision of the majority. The majority's creation of a new privilege is fraught with danger and uncertainty as to what persons will be permitted to assert the privilege and under what circumstances the assertion of the privilege will be sustained. As will be discussed below, there is no basis in the federal constitution, the State constitution, or the common law for the creation of such a privilege. Hence, I dissent. Our courts do not belong to the judges, the lawyers, the

press, or any other class, but rather they belong to the people and serve as a forum wherein truth can be learned and rights can be vindicated. It is truly a sad day when, in the name of "the people's right to know," a barrier is erected which will prevent the people and its courts from learning the truth.

The majority finds support for its creation of a qualified federal constitutional privilege in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). No matter how one may attempt to interpret *Branzburg,* the opinion of the Court of four Justices, specially concurred in by a fifth, states, 408 U.S. at 689–690, 92 S.Ct. at 2661:

> "Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. *This we decline to do.*"

However much my brethren might wish that *Branzburg* had created the privilege asserted by the majority today, *Branzburg* simply does not do so. *See also United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), in which the Court held that every citizen, including the President of the United States, has a duty to appear and testify in the courts of the people.

As stated by Judge Sirica in *United States v. Liddy,* 354 F.Supp. 208, 214 (D.D. C.1972):

> "There can be little dispute that the common law recognized no privilege which would support a newspaper or reporter in refusing, upon proper demand, to disclose information received in confidence. Such a privilege, if it exists, must grow out of the First Amendment free press guarantee. Quite appropriately, in this Court's view, the Supreme Court has recognized as component parts of that guarantee the freedom to publish without prior governmental approval, a right of circulation, freedom to distribute literature, and the right to receive printed matter. And most recently with the Supreme Court's decision in *Branzburg,* it may be said that a right to gather news has been explicitly acknowledged. While acknowledging this corollary right, however, the Court rejected the claim that such a right implies a privilege to protect the identity of news sources. After citing numerous cases in which restrictions on the right to gather news have been sustained, the Court classified the requirement to answer subpoenas and disclose sources as another instance of permissible restriction."

*Accord Tofani v. State,* 297 Md. 165, 465 A.2d 413 (1983); *Georgia Communications Corp. v. Horne,* 164 Ga.App. 227, 294 S.E.2d 725 (1982); *Com. v. Corsetti,* 387 Mass. 1, 438 N.E.2d 805 (1982); *Newburn v. Howard Hughes Med. Inst.,* 95 Nev. 368, 594 P.2d 1146 (1979); *Matter of Farber,* 78 N.J. 259, 394 A.2d 330, *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Ammerman v. Hubbard Broadcasting, Inc.,* 91 N.M. 250, 572 P.2d 1258 (App.1977), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978); *Caldero v. Tribune Pub. Co.,* 98 Idaho 288, 562 P.2d 791, *cert. denied,* 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977). *See also Gagnon v. Dist. Court In & For Cty. of Fremont,* 632 P.2d 567 (Colo.1981) (treating the issue of whether newsgatherer's source should be compelled disclosed as a question of relevance under civil procedure Rule 26(b)(1)).

I turn now to the assertion by two members of the majority that the Idaho Constitution provides a bulwark behind which certain persons may hide and refuse to testify in court. Those two members of the Court do not inform us as to why a different result follows when viewing the Idaho Constitution than that which is reached in interpreting the federal constitution. My only conclusion is that they view the decisions of the United States Supreme Court as foreclosing the federal constitution as a source of a privilege, but since the

result is foreordained, they seize upon the Idaho Constitution as a convenient vehicle by which to obtain the desired result. Such, of course, ignores the previous decisions of this Court.

In *Caldero v. Tribune Pub. Co.*, 98 Idaho 288, 562 P.2d 791, *cert. denied*, 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977), the Court held that no privilege in an absolute or qualified form existed by reason of either the federal or the Idaho Constitution. The Court stated, 98 Idaho at 294, 562 P.2d at 797:

> "[O]ur reading of *Branzburg v. Hayes* ... is to the effect that no newsman's privilege against disclosure of confidential sources founded on the First Amendment exists in an absolute or qualified version. The only restrictions against compelled disclosure appear to be in those cases where it is demonstrably intended to unnecessarily harass members of the news media on a broad scale by means having an unnecessary impact on protected rights of speech, press or association."

That language of *Caldero* was couched in the context of a civil libel case. Its language is even more compelling when viewed in the context of today's case, *i.e.*, a *Branzburg* type criminal proceeding in which the rights of society are sought to be vindicated and pursued by the enforcement of criminal sanctions for the violation of statutes enacted by the people.

The result of *Caldero* was affirmed in *Sierra Life Ins. v. Magic Valley Newspapers*, 101 Idaho 795, 623 P.2d 103 (1981), a decision wherein Bistline, J., writing for the majority, stated, 101 Idaho at 800, 623 P.2d at 108, "[T]he holding in *Caldero* and its application to the facts of this case [are] of concern. The debate over the validity of *Caldero* was apparently put to rest by the United States Supreme Court in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)." In *Sierra Life*, a newspaper libel defendant had asserted "that the initial error here was in the trial court's order directing the defendants to reveal their confidential sources, and that a correct ruling at that point would have avoided placing the court in the ensuing situation which resulted in the imposition of sanctions." 101 Idaho at 800, 623 P.2d at 108. Thus, the Court in *Sierra Life*, although reversing for what it perceived to be overly harsh sanctions, did not modify *Caldero*.

Most recently, in *Marks v. Vehlow*, 105 Idaho 560, 671 P.2d 473 (1983), the Court drew a parallel to *Branzburg* and rejected the assertion of a newsman's privilege to refuse to appear and testify. That opinion was cast in the context of a newsman's refusal to supply information pertinent to the location of a kidnapped child. Donaldson, C.J., writing for the majority, stated:

> "Because we find a compelling and legitimate governmental interest in assuring the efficacy of the writ of habeas corpus, we hold that here there is no qualified newsman's privilege beyond the usual inquiry concerning relevance and materiality of the information sought. Furthermore, we believe that the obligation to attend and to give testimony in a habeas corpus proceeding wherein liberty interests are determined is at least as compelling as the duty to appear before a grand jury, *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); cf. *Matter of Farber*, 78 N.J. 259, 394 A.2d 330, 334 (obligation to appear on behalf of a criminal defendant as compelling as duty to appear before a grand jury), cert. denied, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). The concealing of information or the identities of informants which could lead to the discovery of a person sought by means of habeas corpus proceedings should be discouraged. We therefore decline to establish a specific newsman's privilege with respect to such information." 105 Idaho at 568–569, 671 P.2d at 481–482.

The majority postulates no rationale why it departs from the previous decisions of this Court. As the press is viewed from a national perspective in *Branzburg*, so also I view the press in Idaho. I do not find the press in this State to have been in the past

the craven tool of government, of the courts, or of special interests groups. I do not find that its vigor, assertiveness, or dedication to the public's right to know has in any way been diminished or hamstrung by the previous decisions of this Court. Under our constitution, as it has been interpreted, the press within the State of Idaho may be many things. At times it is accused of being arrogant, abrasive, and overly intrusive. At other times its critics suggest bias in its reporting of the news or outrageousness in its editorial opinion. Whatever its virtues or its faults, no one appears to argue its dedication and ability to inform the public. Nor do any of its critics suggest that the press in Idaho lies supine under the heel of authority. Simply put, the assertions of the majority of dangers to the press are overblown, nonexistent, and ignorant of the teachings of history.

Appellant also argues, and Bistline, J., apparently agrees, that this Court should exercise its authority to create a common law privilege which insulates certain persons from the usual mandate of the law to appear and give evidence in the courts on the grounds that "it is indisputable that in light of present day society there does exist in the common law a qualified journalistic privilege." To suggest, as does Bistline, J., that the common law is dynamic and capable of growth, evolution, and adaptation is only to posit that such privilege has not existed in the common law, and that the common law should be changed to accommodate the need for such a privilege. The whole basis of the common law is its effort to resolve disputes by determining where the truth might lie.

Privileged communications during the past hundreds of years have been recognized, but each has been bottomed on a clearly enunciated and understood rationale. At common law, a privilege was recognized for communications between spouses during marriage,[1] for disclosures by clients to their attorneys,[2] and for military and diplomatic government secrets.[3] There appears to have been no privilege at common law as to information obtained as a result of a physician-patient relationship,[4] and while priest-penitent privilege was discussed in early cases, Wigmore has concluded that the privilege was not established or accepted by common law.[5]

Beyond those enunciated testimonial privileges, judicial creation of other privileges is disfavored because such evidentiary privileges preclude reliable evidence from being placed before the court, and the search for truth is thereby obstructed. *Caldero v. Tribune Pub. Co.*, 98 Idaho 288, 562 P.2d 791, *cert. denied,* 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977).

Beyond judge-made privileges, legislative enactments have created, recognized, or defined certain privileges. *See, e.g.,* I.C. § 9–203(1) (interspousal communications); I.C. § 9–203(2) (attorney-client communications); I.C. § 9–203(3) (confessions made to clergy); I.C. § 9–203(4) (information ac-

1. Marital communications privilege: *See* 8 Wigmore on Evidence §§ 2227–2243 (McNaughton Rev.1961); McCormick on Evidence, Chapter 9 (3d ed. 1984); Bell, Handbook of Evidence for the Idaho Lawyer, pp. 73–75 (2d ed. 1972). *See also Shields v. Ruddy,* 3 Idaho 148, 28 P. 405 (1891) (marital privilege recognized by statute).

2. Attorney-client privilege: *See Later v. Haywood,* 12 Idaho 78, 85 P. 494 (1906); *State v. Perry,* 4 Idaho 224, 38 P. 655 (1894); 8 Wigmore on Evidence §§ 2290–2329 (McNaughton Rev. 1961); McCormick on Evidence, Chapter 10 (3d ed. 1984); Bell, Handbook of Evidence for the Idaho Lawyer, pp. 71–73 (2d ed. 1972).

3. Government secrets: *See* 8 Wigmore on Evidence §§ 2367–2379 (McNaughton Rev.1961); McCormick on Evidence, Chapter 12 (3d ed. 1984); *Penn Mutual Life Ins. Co. v. Ireton,* 57 Idaho 466, 65 P.2d 1032 (1937).

4. Doctor-patient privilege: *See* Bell, Handbook of Evidence for the Idaho Lawyer, pp. 75–76 (2d ed. 1972); 8 Wigmore on Evidence §§ 2380–2391 (McNaughton Rev.1961); McCormick on Evidence, Chapter 11 (3d ed. 1984).

5. Priest-penitent privilege: *See Angleton v. Angleton,* 84 Idaho 184, 370 P.2d 788 (1962) (decided on the basis of I.C. § 9–203); 8 Wigmore on Evidence §§ 2394–2396 (McNaughton Rev. 1961); McCormick on Evidence, p. 184 (3d ed. 1984); Bell, Handbook of Evidence for the Idaho Lawyer, p. 78 (2d ed. 1972).

quired by virtue of the doctor-patient relationship); I.C. § 9–203(5) (official confidences made to a public officer); I.C. § 9–203(6) (communications between school counselor and student); I.C. § 9–203(7) (parent-child communications); I.C. § 54–2314 (psychologist-client secrets); I.C. § 54–3410 (1982) (disclosures between professional counselor and client); I.C. § 54–3213 (consultations with social workers); I.C. § 39–1392b (hospital records). Those privileges have presumably been debated and resolved in the hard light of legislative policy decisions wherein duly elected representatives of the public, selected for their ability to make policy decisions, considered the pros and cons.

As noted by the majority opinion, some states have enacted statutes which, to varying extents and under certain circumstances, insulate the press from testimonial requirements. Our legislature has not seen fit to enact such a statutory privilege. Indeed, there appears substantial debate among the membership of the press as to the desirability of enactment of such "shield laws." Substantial numbers of the press hold to the view that such shield legislation is a subjugation of the press to the legislative branch of government, and that what the legislature giveth, it may at another day take away. Most thoughtful members of the press suggest that disclosure or nondisclosure is and should be a matter of individual conscience. Others suggest that it is within the realm of ethics of a profession. Those who argue ethics, of course, are also among the first to argue that the membership of the press is not restricted to any orthodox or recognizable class, nor is it to be licensed by the government as are doctors or lawyers. Hence, there can be enforced no journalistic code of ethics, nor can a breach thereof be punished, since no authority exists over members of the so-called class. When one views the need for adaptation of the common law to create the asserted privilege, it appears that the inability to fashion extents and limits, the failure to demonstrate otherwise adverse results, and the need of society to discover truth in its court proceedings, all militate against the creation of the asserted privilege.

Our rules of civil procedure and our retention of sanction powers traditionally exercised by our courts adequately shield witnesses, including reporters, from undue harassment and vexation. Limitation or termination of examinations conducted in bad faith is authorized, I.R.C.P. 30(d), as are protective orders to prevent annoyance, embarrassment or oppression of any person during court proceedings, I.R.C.P. 26(c).

The instant case is cast in terms of a criminal prosecution. Information is being withheld which is allegedly of assistance to that prosecution. The alleged crime is not perhaps the most important, but it nevertheless involves proscribed criminal behavior. Society has a substantial interest in, and a right to, enforcement of its criminal statutes. Although Bistline, J., asserts a difference between the right of a defendant to secure information for his defense, and the right of society to secure information for effective prosecution, I disagree that such a distinction should be made. Today's case involves a prosecution whose purposes and methods may be offensive to certain members of the press. Hence, there is a refusal to testify. Tomorrow's case may involve the withholding of information potentially beneficial to a criminal defendant whose views or conduct may be equally offensive to certain members of the press. I respectfully suggest that there is no difference in the two cases, and that this Court, having created the privilege, must be equally willing to enforce it in either case, however distasteful the result.

Valid efforts to reduce violence and enforce statutes proscribing unlawful activity should not be thwarted by stretching of the common law or of the constitution solely to accommodate the special interests of criminal informants. At bottom, an orderly society depends upon vindication of its rights in the courts. The rights of individuals and society cannot be determined and protected by the courts, unless those courts are allowed to undiscriminatingly and fairly pur-

sue the truth. I view today's decision as an unnecessary and unjustified intrusion into our judiciary's search for truth.